## In re DENVER & R. G. W. R. CO.
### No. 8669.

District Court, D. Colorado.
Nov. 1, 1944.

See also 38 F.Supp. 120.

Wilham V. Hodges, of Denver, Colo. (F. C. Nicodemus, Jr., of New York City, Hodges, Vidal & Goree, of Denver, Colo., and Pierce & Greer, of New York City, on the brief), for Denver & Rio Grande Western R. Co., and Denver, Salt Lake Western R. Co.

Edward E. Watts, Jr., of New York City, and Milton J. Keegan, of Denver, Colo. (Peter H. Holme, of Denver, Colo. and Mitchell Capron, Marsh, Angulo & Cooney, of New York City, and Pershing, Bosworth, Dick & Dawson, of Denver, Colo., on the brief), for appellant City Bank Farmers Trust Co.

H. H. Larimore, of St. Louis, Mo. (J. W. Preston, of Pueblo, Colo., and R. L. Dearmont, of St. Louis, Mo., on the brief), for appellant Guy A. Thompson, Trustee.

George D. Gibson and Henry W. Anderson, both of Richmond, Va. (Grant, Shafroth & Toll, of Denver, Colo., and Hunton, Williams, Anderson, Gay & Moore and Nan Ross McConnell, all of Richmond, Va., on the brief), for appellees Insurance Group Committee.

386

Norma L. Comstock, of Denver, Colo. (Alexander M. Lewis and Rathbone, Perry, Kelley & Drye, all of New York City, on the brief), for appellee Central Hanover Bank & Trust Co., Trustee.

Edwin S. S. Sunderland, of New York City (Dines, Dines & Holme, of Denver, Colo., and Davis Polk, Wardwell, Sunderland & Kiendl, Thomas O'G. Fitzgibbon, and Judson C. McLester, Jr., all of New York City, on the brief), for appellee Guaranty Trust Co. of New York, Trustee.

James L. Homire, of Washington, D. C. (James A. Marsh, of Denver, Colo., and Emmet McCaffery, of Washington, D. C., on the brief), for appellee Reconstruction Finance Corporation.

Lindsey & Larwill and Daniel K. Wolfe, all of Denver, Colo. (Stewart & Shearer, of New York City, on the brief), for appellee United States Trust Co. of New York, Trustee.

Lewis & Grant, of Denver, Colo. (Milbank, Tweed & Hope and Arthur A. Gammell, all of New York City, on the brief), for appellee Chase Nat. Bank of City of New York, Trustee.

SYMES, District Judge.

By order of March 23, 1944, the Interstate Commerce Commission on April 26, 1944, submitted for acceptance or rejection by creditors of Classes 6, 7, 8, 10a, 10b and 11, 12a and 12b of the Denver & Rio Grande Western Railroad Company, the above debtor, and by creditors of Classes 1 and 2 of the Denver & Salt Lake Western Railroad Company, as therein provided, a plan for the reorganization of the debtor, the Denver & Rio Grande Western Railroad Company and of the Denver & Salt Lake Western Railroad Company—a subsidiary debtor—approved by the Commission in its Third Supplemental Report and Order of June 14, 1943, and approved by this court October 25, 1943.

Under date of July 4, 1944, the Commission has certified to this court the results of the vote on the submission of the plan of reorganization to the creditors of the Denver & Rio Grande Western Railroad Company, debtor, et al., as aforesaid, showing that said plan had been accepted by more than two-thirds in amount of the total of such claims voting, except that creditors of Class 11, holding $1,332,050 principal amount of Denver & Rio Grande Western Railroad Company General Mortgage Bonds, constituting 20.67% of the total amount of allowed claims of said class, voted for the plan, and creditors of said class holding $5,111,100 principal amount, or 79.33% of allowed claims of that class, voted to reject the plan.

Thereafter objections to the confirmation of the plan were filed by the debtor, the Denver & Rio Grande Western Railroad Company, by Guy A. Thompson, Trustee of the Missouri Pacific Railroad Company, and by the City Bank Farmers Trust Company of New York, Trustee of the General Mortgage aforesaid. Said objections were set down for, and came on for hearing on August 30 and 31, 1944, pursuant to notice to all parties. Full argument and hearing were had. Briefs were filed on behalf of said objectors, and in reply thereto by other trustees and interested parties.

The claim of the General Mortgage Bonds on the effective date of the plan aggregated $43,500,000—about one-fourth of the debtor's entire debt. It is claimed that when the capitalization of the new company was fixed at $155,173,127 on the basis of consolidation with the Denver & Salt Lake, and $143,528,027 for the debtor alone, if consolidation is not carried out, the Commission took care of every bond issue ahead of the General Mortgage (a junior issue), for 100% of their claims in new securities, and what was left over went to the General Mortgage. At that time the so-called Junction Bonds were in the hands of the public and in the plan the Commission provided that the Rio Grande Junction 5s—whose claim amounted to $2,758,333—should receive 77% thereof in First Mortgage Bonds, $2,123,916 par, and 23% in Income Bonds, or $634,417 par, and that after all the creditors ahead of the General Mortgage bondholders were taken care of, there was only enough common stock left over to give the General mortgagees 10% of their claim in par value common stock.

That thereafter the wartime earnings of the property were so large that the cash jumped from $10,000,000 to $20,000,000, or better, and counsel says the court very appropriately in September, 1943, instructed the Trustees to buy the Junction Bonds at par and accrued interest and reduced the senior debt by that amount. That by reason thereof the trustee of the General Mortgage Bonds now asks, not for any change whatever in the valuation or capitalization of the debtor, but simply an adjustment such as it says the Commission

authorized to be made within the framework of the plan by a redistribution of the new securities that the plan allots to the Junction Bonds, and in so doing maintain the same priority as before between the various issues. That it is simply a matter of accounting.

It is argued that in several other railroad reorganizations, that between the time the Commission put down a plan and the time it got to the court for action, the surplus cash of the respective debtors increased very much so the senior debts could be reduced. That in cases that have come down from the Interstate Commerce Commission since last September it has been said if the surplus cash is used to reduce the senior debt and stops there, for practicable purposes the capitalization of the new company is reduced below that authorized and what the Commission has found the debtor should and can reasonably support. That the way to adjust is to take the new securities allotted to the senior bonds or debt thus paid off and redistribute them, keeping everybody's position relatively the same. That this would shove everybody up a little and give the junior issues better treatment.

It is further urged by this mortgage trustee that the reorganization committee or court should make this adjustment on the basis of the distribution the Commission has followed, and distribute the $2,758,333 bonds set aside to exchange for the Junction Bonds in the plan, keeping the same priorities.

In support of this theory attention is directed to the New Haven reorganization, In re New York, N. H. & H. R. Co., D.C., 54 F.Supp. 595, and Id., D.C., 54 F.Supp. 631. In that case there were certain first and refunding mortgage bonds up as collateral to secure six bank loans aggregating $26,000,000.

The court took $18,000,000 of surplus cash resulting from wartime earnings and with the Commission, decided they could apply it to reduce the claims of the banks by paying the accumulated interest thereon. The problem then was to make a redistribution of the $18,250,000 in bonds provided for in the plan for that purpose, and the court held it should be redistributed along the line that counsel are contending should be done here.

Judge Hincks says by paying off the accumulated interest thereon the secured claims were reduced, so that only $84,-

800,000 in fixed interest bonds was required, this resulting in a capital structure with a bonded indebtedness less than that which the Commission had found the railroad could reasonably support. Thus a block of $6,000,000 in fixed interest bonds and $11,680,000 in income bonds became available to sweeten the treatment previously proposed for all mortgage creditors. And this was done. Judge Hincks, however, adds that all creditors agreed that these excess securities should be distributed to all secured creditors not already awarded the full value of their claims in fixed interest bonds.

Judge Hincks then went further and paid the bank loans in full out of surplus cash and said, I quote (54 F.Supp. at page 608):

"I doubt whether these conclusions require that the plan be returned to the Commission. I incline to believe that the necessary correction can be accomplished within the framework of the plan in complete conformity with all the valid findings of the Commission."

By analogy counsel argue that in the Rio Grande situation the $2,123,916 Fixed Interest Bonds and $634,417 of Income Bonds allocated to the Junctions should be used to sweeten the treatment previously proposed for all mortgage creditors who have not already been awarded the full value of their claims in Fixed Interest Bonds.

What Judge Hincks did was to pay the bank loans off in full out of surplus cash, stating he believed this action could be accomplished by the court within the framework of the plan without returning it to the Commission, and that his action was based upon the findings of the Commission and was consistent with its limitations and within the power of the judge to make. Later the Commission filed a report approving everything Judge Hincks had done in this respect.

Judge Hincks, however, after expressing doubts whether his action required the plan be returned to the Commission, stated, 54 F.Supp. at page 608:

"I incline to believe that the necessary correction can be accomplished within the framework of the plan in complete conformity with all the valid findings of the Commission."

In view of the sharp division between the functions of the district courts and the Commission in § 77, 11 U.S.C.A. § 205, reorganizations announced by the Supreme

Court (Ecker v. Western Pacific R. Corporation, 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 and Group of Institutional Investors v. Chicago Milwaukee S. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959), the action of Judge Hincks is hardly authority—at least until approved by an appellate court. What he really did was to make his ruling and then ask the Commission to approve.

In the final analysis, however, what Judge Hincks really did in the New Haven case was to pay off an obligation of the estate, while here the court in its treatment of the Junction Bonds did not pay off a debt, but only purchased securities, thereby giving the debtor control of another railroad property, to wit, the Rio Grande Junction Railroad Company—a necessary part of its system.

The plan itself does not contemplate the capitalization of the new company be absolutely static, but subject to change, because it provides, as Mr. Gibson well points out (p. 10142 of the printed court record and p. 66 of the court reprint) :

"The capitalization of the new company, as of January 1, 1943, after consummation of the plan, including the merger or consolidation of the Salt Lake, shall consist substantially of the following securities, excluding those to be pledged, the amounts stated being subject to reduction to the extent, if any, that matured interest proposed to be funded in the plan is paid, and as equipment obligations or other liabilities are paid or reduced, * * *."

■ Frankly, I do not believe the court has the power to make the reallocation requested by the General Mortgage trustee because it would, in effect, change the allotment of every security dealt with in the plan.

■■ Counsel argue that the court has the power asserted under § T, p. 105 of the printed plan, where the Commission says:

"The court may cure any defect, supply any omission, or reconcile any inconsistency, in such manner or to such extent as may be necessary or expedient to carry out the plan effectively".

The Commission, however, has no power to delegate powers or duties to the court. It is not claimed there is a defect in the plan, nor that there is any omission or inconsistency.

The modification in the Milwaukee case referred to is contained in "Summary of Second Supplemental Report of the Commission" dated December 6, 1943, and says:

"This report approves certain adjustments of the plan of reorganization of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company approved * * * June 4, 1940."

Furthermore it appears in said report that the Commission itself distributed $52,038,036 of cash on account of interest accruing during the trusteeship, not authorized by the court. Next the Commission stated that in view of the payment of a bank loan and the reduction in amount of the claim of the Reconstruction Finance Corporation since the date of the plan, and the distribution to creditors of $5,000,000 of first mortgage bonds previously set aside for new money, approximately $7,096,336 of first mortgage bonds will be issued to the Milwaukee & Northern first mortgage bondholders, Milwaukee & Northern consolidated mortgage bondholders and the debtor's general mortgage bondholders "in addition to the amounts of such bonds allotted to them in the plan previously approved." In other words, the Commission itself made an allocation, which in the case at bar it is urged the court make.

■ Next the objectors in support of their objections complain of a too low capitalization of the new company. In view of the past history of this property it is hard for this court to take stock in any such argument. The court has attempted to dispose of it in previous opinions, and it has been rejected by the Supreme Court, infra. The permissible capitalization is a matter entirely under the jurisdiction of the Interstate Commerce Commission. Ecker v. Western Pacific R. Corporation, supra, 318 U.S. at page 483, 63 S.Ct. at page 712, 87 L.Ed. 892.

■ In the Milwaukee case, supra, 318 U.S. at page 541, 63 S.Ct. at page 738, 87 L.Ed. 959, the Supreme Court said:

"Certainly there is no constitutional reason why earning power may not be utilized as the criterion for determining value for reorganization purposes. And it is our view that Congress when it passed § 77 made earning power the primary criterion."

A factor that cannot be overlooked in capitalizing earnings is the steady and material reduction in average revenue per ton mile—the basic index of the gross yield from transportation service. The average revenue of this road per ton mile declined

from 1.765 cents in 1921 (Rio Grande annual report 1936, p. 27), to 0.994 cents in 1943 (annual report 1943, p. 29), a decrease of almost 50%.

Other factors which dampen optimism as to the continuation of higher earnings in the future are income taxes which this road has not been liable for since 1930, except 1942 and 1943, and very large increases in operating expenses, as shown in the Commission's 1939 report on a plan. This shows greatly increased operating costs, such as wages, fuel, materials and supplies of all kinds, and more than offsets the economies effected by the Improvement Program. Dividends have not been paid on either class of Rio Grande stock since 1911.

A study of the traffic gains of the railroads of the country indicates that in the third year of complete wartime prosperity the western carriers will be the most outstanding beneficiaries of the increase in railroad gross earnings. For many years before the war the western carriers suffered sharply reduced revenues, wholly inadequate to cover bond interest and fixed charges. Most of the bankrupt railroads are located west of the Mississippi River.

In the early upswing of business in 1940 and 1941 the western group failed to match the operating improvement made by the eastern carriers, and it was not until 1942 that an abrupt change in operating conditions resulted in the western roads reaping the harvest of profits comparable to the gains of the eastern roads.

The reasons for this are the tremendous increase in transcontinental traffic due to the war in the Pacific, restrictions on shipping, and the closing of the Panama Canal. Also the lessening of truck competition, which in the past played havoc with the western carriers, but has largely ceased as a competitive factor since 1942. Also passenger business has returned to the railroads in large volume due to these wartime limitations on motor transportation. The Southern Pacific, for instance, shows an increase in passenger revenues from $24,000,000 in 1940 to $124,000,000 in 1943 and may reach $150,000,000 in 1944. The St. Louis & San Francisco shows an increase in passenger revenue from $3,000,000 in 1940 to $23,000,000 last year. The expected shift in war equipment to the Pacific combat area may sustain these increased earnings of western railroads for a few years after the war.

Another favorable factor is: Normally eastbound railroad traffic of the western and eastern carriers is heavier. War traffic demands have, however, brought about a divergent shift for the two groups, and there are indications that this factor will last as long as the war with Japan. But the end to the war will undoubtedly result not only in a sharp contraction of freight tonnage but also restore the former unfavorable balance of train movements.

It is estimated that 60% of the inflated earnings of the debtor for the last three or four years is due to Government and war business both freight and passenger, but as has already been pointed out by this court, as well as the Supreme Court, war earnings are not a sufficiently stable basis for new capitalization.

Counsel refers to new industries located along the line of this debtor, but does not list them or state whether they are permanent or not. Of the few plants located along the line known as war industries, Camp Hale—a training camp at Leadville, Colorado—has been abandoned and practically no personnel left. The Kalunite plant, located in the Roper Yards outside of Salt Lake—which treats alunite ores—is still operating, but it is anticipated it will not survive the war. The Remington Arms plant at Salt Lake has been closed and is now used only as a storage depot. The activities of the Remington plant at Denver are greatly curtailed. The Kearns Replacement Center in Utah, while still fairly active, will eventually be closed. Camp Carson at Colorado Springs is already greatly reduced in size. The Naval Supply Depot at Clearfield, Utah, and the Columbia Steel plant at Geneva, Utah, are the only ones promising any permanency as business producers for this property.

█ The plan gives the old Junction Bonds $2,123,916 in the new First Mortgage Bonds and $634,417 in new Income Bonds. Under the priority rule of the Boyd case, Northern Pac. R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, in any reallotment of these senior securities they would mostly go to the First Trust 4s and the Western Consolidateds, and the so-called sweetening process would increase the General Mortgage Bonds' allotment very little, if any. The most they would get would be more common stock which has little or no value, and would only dilute the value of the common stock they now get. True they might get more stock—that

is, more pieces of paper—the total value of which would be little, if any more, than of that they now get.

It is said the debtor's income available for interest during trusteeship aggregated $28,700,000, which, according to counsel, was used by the Trustees to carry out an improvement program, and that this expenditure is reflected in greatly increased earnings that would well support an increased capitalization.

The net operating income of this property available for interest, as restated under the plan, for the year 1941 was $3,428,000; 1940, $1,966,878; 1939, $1,235,209, and in 1938 and 1937 there was a deficit. The net after interest accruals and other charges under the new plan for 1941 was $683,082. In 1939 there was a deficit for said purpose of $502,808, and for 1938 there was a deficit of $2,172,128; in 1937 a deficit of $3,840,548.

From the calendar year 1932, up to and including the calendar year 1940, there was only one year, 1933, when there was available for interest on the new Income Bonds the amount the plan calls for, and then only by disregarding the cumulative interest provision of the plan. This was at a time when every economy was practiced by the debtor at the expense of maintenance of the property. In addition this was one of the years in which money was borrowed to pay current taxes and interest not earned on the Denver & Rio Grande First Consolidated and the Rio Grande Western First Trusts.

The court in its plan of March 6, 1941, gave the General Mortgage bondholders more common stock than does the approved plan. The Commission, however, could not agree with our views, and it would seem to be a useless gesture for the court to make the same error again, assuming we had the power.

■ A basic requirement of any reorganization, according to the Supreme Court, "is the determination of a capitalization which makes it possible not only to respect the priorities of the various classes of claimants but also to give the new company a reasonable prospect for survival. * * * Only 'meticulous regard for earning capacity' * * * can afford the old security holders protection against a dilution of their priorities and can give the new company some safeguards against *the scourge of overcapitalization*." (Emphasis

ours.) Group of Institutional Investors v. Chicago, Milwaukee, St. P. & P. R. Co., supra, 318 U.S. at pages 540, 541, 63 S.Ct. at page 738, 87 L.Ed. 959.

■ Boiling the argument down, in the final analysis it is the old one of security holders having made an unwise investment and now look to the bankruptcy court to restore values by some sleight of hand or legerdemain, which never existed or have been wiped out by mismanagement. A § 77 bankruptcy reorganization proceeding, however, contemplates the scaling down of all claims and that the security holders may take a substantial loss. The procedure is not one designed to recoup losses.

■ The $25,000,000 or more the Trustees have expended in the Improvement Program inures to the benefit of the common stock. If the latter is worth anything it is as much due to these expenditures as to any other factor. This, with the increase in current assets and wartime earnings which counsel seem to believe are permanent, constitute the only equity behind the preferred and common stock.

No security holder is getting what he thinks he should. All have suffered losses. The plan is not the best imaginable—it is the only one of several that have come before the court with the practically unanimous approval of all interested parties. And in the court's opinion, any further delay or resubmission to the Commission would prejudice the successful and speedy consummation of the reorganization of this debtor and its removal from the court—a consummation devoutly desired.

For the reasons stated the court does not believe the objections under consideration are tenable, and the plan having been accepted by two-thirds in amount of the total voting of the allowed claims of each class voting, except the one, such acceptances not having been made or procured by any means forbidden by law, the court, after full hearing, hereby finds it makes adequate provision for fair and equitable treatment for the one class of creditors rejecting it, to wit, the holders of the General Mortgage Bonds, and their rejection is not reasonably justified in the light of the respective rights, and all of the relevant facts and interests of those rejecting it. And furthermore, that it conforms with all provisions of subsection e of § 205, 11 U.S.C.A.

A recapitulation of the vote on the plan indicates that 40.77% of the total outstand-

ing claims in the hands of the public voted to accept the plan, only 4.99% voted against. It would seem inequitable to reject this plan, approved, as it is, by all except a small minority of the total securities voting, especially if we consider the length of time the property has been in the hands of the court, and the exhaustive hearings on these same objections that have been had both before the Interstate Commerce Commission and this court.

■ But even if the petition of the City Bank were granted the so-called Insurance Group which approves this plan would, in any reallocation, receive the senior securities that the objecting trustee refers to. This because Mr. Justice Douglas in the Milwaukee opinion, supra, states that compensation must be given to the senior creditors for their sacrifice of their senior position in taking junior securities, and it is only after their claim is fully satisfied that anything can be allocated to junior liens.

The General Mortgage bondholders say, in effect, that the $2,700,000 in new First Mortgage and Income Bonds thus released would go to the senior creditors; that this in turn would free an equal amount of junior securities now allotted to senior bondholders, which would, in turn, go to the second lienors, thus freeing finally the most junior securities, that is stock, to the General Mortgage Bonds. In the opinion of the court such a reallocation of securities can only be made by the Commission. The net result would be that the senior creditors would receive a larger amount of senior securities than they do now.

■ The only class of creditors who have failed to assent are the most junior in this picture who, as a condition of their assent, ask for an increase in the total capitalization. But, for reasons stated and authorities cited, this is a matter clearly within the power of the Commission, which has rejected the argument more than once.

As to the non-assenting classes the language of the statute is:

"if the plan has not been so accepted by the creditors and stockholders, the judge may nevertheless confirm the plan if he is satisfied and finds, after hearing, that it makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it." And: "that such rejection is not reasonably justified in the light of the respective rights and in-

terests of those rejecting it and all the relevant facts." And finally: "that the plan conforms to the requirements of clauses (1) to (3), inclusive, of the first paragraph of this subsection (e)".

■ I am satisfied, and find after hearing, that all the requirements of the statute have been met; that it makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it, and it is hereby confirmed.

Proper findings and order as required may be prepared and submitted by counsel.