INSURANCE GROUP COMMITTEE ET AL. *v.* DEN-
VER & RIO GRANDE WESTERN RAILROAD CO.
ET AL.

No. 690.  Argued January 6, 1947.—Decided February 3, 1947.

608

*George D. Gibson* and *Kenneth F. Burgess* argued the cause for petitioners. With them on the brief were *Henry W. Anderson, John W. Riely, Morrison Shafroth, William Grant, Walter J. Cummings, Jr., Alexander M. Lewis, Edwin S. S. Sunderland, James L. Homire, W. A. W. Stewart* and *Arthur A. Gammell.*

*William V. Hodges* and *Frank C. Nicodemus, Jr.* argued the cause and filed a brief for respondents.

Mr. Justice Reed delivered the opinion of the Court.

On November 29, 1944, the District Court for the District of Colorado confirmed a plan of reorganization for the debtor, the Denver & Rio Grande Western Railroad Co., 62 F. Supp. 384, notwithstanding the rejection of the plan by holders of the General Mortgage bonds pursuant to § 77 (e). Upon appeal the Circuit Court of Appeals reversed the order of confirmation. This Court granted certiorari, reversed the Circuit Court and affirmed the order of confirmation. 328 U. S. 495. The debtor con-

sistently opposed the plan throughout those proceedings. After the opinion of this Court was filed on June 10, 1946, the debtor petitioned for a rehearing, which was denied October 28, 1946. At about the same time as that of filing its petition for rehearing, it moved in the District Court (September 17, 1946) for a re-examination of the plan in the light of circumstances which had changed since the Interstate Commerce Commission's hearings on the plan in May, 1941. 254 I. C. C. 5, 6. The debtor specified three categories of changed conditions: "(a) The decline in money rates to a level far below the rates prevailing at these dates; (b) The recent public offering by the Government and purchase by private capital for private operation of the steel plant at Geneva, near Provo, Utah, which had been constructed by the Government in the exigencies of the War at a cost in excess of $200,000,000; (c) A permanent elevation of the National income through intensified industrial activity involving for the indefinite future a greatly increased demand for railway transportation."

The debtor prayed that upon re-examination the District Court set aside its order of October 25, 1943, approving the plan, and its order of November 29, 1944, confirming the plan, and refer the proceeding back to the Interstate Commerce Commission for the formulation of a new plan. After a hearing on a motion to dismiss the debtor's petition but without the introduction of evidence, the District Court dismissed the petition on October 30, 1946, on the grounds that the order of confirmation determined the rights of participation and that the District Court did not now have power to reopen the proceedings. The District Court also held that the petition failed to state a case that justified reconsideration. The debtor filed notice of appeal and requested a stay of execution of the plan on the same day; the latter motion

was denied by the District Court at that time. Thereupon the debtor docketed its appeal in the Circuit Court of Appeals and applied for an order staying execution of the plan until the appeal should be considered. This application of the debtor was granted on November 2, 1946, by an order of Judge Phillips staying proceedings in the District Court to consummate the plan. A petition for certiorari to the Circuit Court was filed in this Court under Judicial Code § 240 (a) which asked that we grant a writ of certiorari to the Circuit Court of Appeals, before judgment, and that the order of the District Court be affirmed in this Court. The grounds urged were that the action of the respondent was in violation of the mandate of this Court issued June 10, 1946, and that even if the mandate had not been violated the denial of the petition to reopen proceedings on the plan was not appealable because the petition for re-examination was in reality a petition for rehearing. Further, petitioner urged that this Court take and decide the whole case because the claim of change of circumstances was repetitious of the same claim rejected by this Court in its June, 1946, decision and that no allegations were made sufficient to justify a re-examination of the plan on account of changes in circumstances since the June decision. Because of the importance of the questions raised to the efficient administration of railroad reorganizations under the Bankruptcy Act, we granted certiorari. 329 U. S. 708.

We may assume, arguendo, that both this Court upon appeal from an order of confirmation in bankruptcy, and the bankruptcy court itself, after its order of confirmation has been affirmed on review (11 U. S. C. § 205 (f)), may take cognizance of subsequent changes in conditions and order a plan re-examined by the Interstate Commerce Commission. On that assumption, we are of the opinion that the debtor has failed to allege the existence of changed

conditions since our decision of June 10, 1946, of a kind not "envisaged and considered by the Commission in its deliberations upon or explanations of the plan." *Reconstruction Finance Corp.* v. *Denver & R. G. W. R. Co.,* 328 U. S. 495, 522. We do not therefore think that re-examination would be justified in this case.

The conclusion in the foregoing paragraph removes the necessity of considering the question whether the respondent disregarded the effect of the judgment of this Court of June 10, 1946, which affirmed the orders of approval and confirmation of the plan. Likewise it disposes of any necessity to determine whether this petition in the District Court was in reality a request for a rehearing. Cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 247.

Upon the same assumption employed above, we ruled in our decision of June 10, 1946, 328 U. S. 495, 534, that in this reorganization no changed circumstances, up to that date, presented to us by the debtor or other respondents in that review justified a re-examination of the plan as confirmed. This ruling was binding upon the District Court and the Circuit Court of Appeals as to changed circumstances arising after the order of confirmation and prior to our decision. When matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court. Thus a cause proceeds to final determination. While power rests in a federal court that passes an order or decision to change its position on a subsequent review in the same cause, orderly judicial action, except in unusual circumstances, requires it to refuse to permit the relitigation of matters or issues previously determined on a former review.[1]

---

[1] *Great Western Telegraph Co.* v. *Burnham,* 162 U. S. 339, 344; *King* v. *West Virginia,* 216 U. S. 92, 101; *Messenger* v. *Anderson,* 225 U. S. 436, 444; *Wichita Co.* v. *City Bank,* 306 U. S. 103, 106. Cf. *Chaffin* v. *Taylor,* 116 U. S. 567, 572.

The debtor's brief and the opinion of the Circuit Court of Appeals on the hearing of the review of the orders of approval and confirmation of the plan make clear that changed circumstances in the period between the Interstate Commerce Commission hearings in May, 1941, and our decision of June 10, 1946, of a like character with those now alleged, were relied upon by the debtor in its former effort to set aside the District Court's orders of approval and confirmation. The debtor argued on the former review, as it again argues, that the plan should not be confirmed because of the "radical lowering for the indefinite future of money rates." And it was emphasized at that time that capitalizing on these lower rates would permit the issuance of a greater volume of securities against earnings of the debtor, and consequently a larger allotment to presently dissatisfied creditors. Every example of railroad refinancing, listed in respondent's present brief to support by illustration the argument of falling interest rates, was listed in the brief on the last review for the same purpose. The purpose was to set forth instances of the issue of railroad securities at interest rates definitely lower than those borne by the debtor's issues. The debtor in its brief of that time also argued the beneficial effects of the "permanent elevation of National income" upon the anticipated earnings of the debtor. Lastly, the debtor there pointed out that the establishment and construction of the great Geneva steel plant was "certain to be revolutionary in its contribution to the new earning power of the Debtor . . ." Although it did not then rely, as it does now, upon the purchase of that corporation by private capital, the argument, then as now, was that the prospective business from a great steel plant was a factor indicating higher earnings. The plant may or may not turn out to be strategically located for private low cost operation and distribution. The shift of ownership has only moderate significance.

In sum, the very kinds of changed circumstances which were argued here formerly as reasons for not approving and confirming the plan of reorganization were presented by the petition now under review to the District Court as reasons why that court should vacate its orders of approval and confirmation, and remand the plan to the Commission for reconsideration. The debtor argues that it only urged this Court to take judicial notice of the existence of these changed circumstances, and that our refusal to do so should not bar it from proving these changes in the District Court. Our holding was not based upon a conclusion that this Court could not take judicial notice of changes in economic conditions subsequent to approval by the Interstate Commerce Commission. We concluded that, even if weighed, the alleged changes were not of a kind which justified re-examination of the plan. 328 U. S. 495, 534.

The questions of interest rates and increased earnings from the Geneva steel plant were considered by the Commission and the District Court before the order of confirmation. The approval of the plan by the Commission on June 14, 1943, appraised economic changes subsequent to the hearings. 254 I. C. C. 349, 356, 358, 359.

The Commission gave consideration to the interest rates the proposed securities should bear. 328 U. S. 495, 515, 516. There was a forecast of available income of $6,215,423 for annual charges in a future normal year. It was thought that this would support a capitalization of $155,000,000 plus, even though more than $35,000,000 of that represented by common stock participated only in earnings above the estimated normal except as to long-range advantages from capital investments and bond sinking-fund payments that had the effect of increasing the value of the common stock equities. 254 I. C. C. 15, 356.

As appears from the tables of capitalization, annual charges and distribution of securities, 328 U. S. 495, 502–503, the interest rates chosen varied with the type of security. As none of the authorized securities are alleged by the debtor to have shown values much above par, the chosen rates of return have not proven to be excessive. See note 6, *infra*. From the various recommendations as to the proper interest for the new first mortgage bonds, the Commission selected finally a fixed rate of three per cent and a contingent rate of an additional one per cent.[2] 233 I. C. C. 537, 542, 554–5; 254 I. C. C. 15, 387. To guard against a drain upon the reorganized railroad if interest rates should fall, a provision appears in the plan[3] for refunding the authorized first mortgage bonds at a maximum premium of 5 per cent. This gives protection to the reorganized road if not to the unpaid creditors and excluded stockholders.

Much the same situation exists as to the Geneva Steel Plant. A discussion occurred before the District Court on October 23, 1942, in which it was recognized that the plant would make a substantial contribution to the traffic of the road. This was the basis for further consideration before approval by the Commission on its reconsideration of the plan, 254 I. C. C. 349, 356. The effect of the existence of this plant received further consideration in the Circuit Court of Appeals, 150 F. 2d 28, 34, 38, 43.

As we indicated above, the alleged increases in the national income were briefed and decided contrary to the debtor's contention on the former review. Nothing was called to our attention in the former review to indicate that an increased level of economic activity above that in actual

---

[2] The earnings contingency which authorized the payment of the prior contingent interest, as expressed in technical detail at 254 I. C. C. 393–94, was the net income less certain fixed charges.

[3] 254 I. C. C. 387.

existence when the order of confirmation was issued had occurred beyond that anticipated by the Commission.[4] Earnings available for interest depend upon costs as well as upon revenue. It might be added to this Court's comments on railroad rate increases, 328 U. S. 495, 522, n. 29, that in handing down its order of December 5, 1946, granting certain increases, the Interstate Commerce Commission considered the necessity of meeting the increased costs.[5]

---

[4] The national income* as reported in the annual publication of the Department of Commerce, The Survey of Current Business, for the following years was, in billions:

| 1940 | 77.6 | 1943 | 149.4 |
|------|------|------|-------|
| 1941 | 96.9 | 1944 | 160.7 |
| 1942 | 122.2 | 1945 | 161.0 |

The national income as computed by the Department of Commerce is tentatively estimated at 164.0 billions for 1946; for 1947, no statement of an expected increase. See The Economic Report of the President to the Congress, of January 8, 1947, H. Doc. No. 49, 80th Cong., 1st Sess., as required under the Employment Act of 1946, 60 Stat. 23.

The Dow-Jones average of the ten first-grade rails was 117.25 on June 10, 1946, but had fallen to 110.73 on December 30, 1946. The market bid for the first bonds of the reorganized debtor, when, as, and if issued, was 101 on June 10, 1946, but had fallen to 89 on December 30, 1946. These latter figures are from the Commercial and Financial Chronicle, issues of June 10 and December 30, 1946.

*National income is the total net income earned in production by individuals or businesses.

[5] While the reports of the Commission deal with the national railroad situation rather than with individual roads, an examination of them does not indicate that the Commission intended to supply by means of the increase in rates a net railway operating income sufficient to give a rate of return on invested capital substantially higher than for normal pre-war years. 264 I. C. C. 695, 722, 728; I. C. C., Ex parte No. 162, December 5, 1946, mimeographed report, p. 7.

See the discussion of increased revenue and costs, mimeographed report, supra, pp. 3, 4, 5.

The Commission made no finding that the cash value of the securities allocated to the senior creditors paid them in full. To justify the change of position of creditors from fully secured to partially secured, creditors were given opportunities to participate in profits through common stock ownership with a chance at larger earnings than the Commission's forecast anticipated. We held the priority rule was satisfied by this type of allocation. This was explained by our decision on the last review. 328 U. S. 495, 517–518. The debtor has made no allegation, either in this effort for re-examination or before, that the existing cash value of the securities allotted any creditor has ever aggregated the amount of the creditor's claim against the debtor.[6] We think the absence of such an allegation, of itself, demonstrates that the plan is not, because of excessive interest, unfair to the debtor or those for whom it is allowed to appear.

---

[6] As far as they are readily available to us, the ranges of the reorganized road's securities traded on a when, as and if issued basis have been as follows:

|  | 1945 | | 1946 | |
|---|---|---|---|---|
|  | High | Low | High | Low |
| First Bonds | 103 | 82 | 102 | 89 |
| Income Bonds | 89½ | 44½ | 89 | 50 |
| Preferred Stock | | | 75½ | 37 |
| Common Stock | | | 35½ | 16 |

Bond ranges are from Year's End Edition of Moody's Bond Record, Vol. 14, No. 1, January 10, 1947; stock ranges are from Standard & Poor's Earnings and Ratings Stock Guide, Year's End Edition, January, 1947.

The highest market bids on the securities so far this year are, so far as the figures are available to us:

| | |
|---|---|
| First Bonds | 89 |
| Income Bonds | 62 |
| Preferred Stock | 50 |
| Common Stock | 16½ |

From Commercial & Financial Chronicle, Editions of January 6, January 13, and January 20, 1947.

Until it can be contended with some show of reasonableness that the creditors senior to the creditors and stockholders whom the debtor represents here have received more in value than the face of their claims, the debtor's insistence on a re-examination of the plan is without substantial support. See *Northern Pacific Ry. Co.* v. *Boyd*, 228 U. S. 482; *Group of Investors* v. *Milwaukee R. Co.*, 318 U. S. 523, 541.

Not only does the debtor fail to allege any actual sales or values of the securities which would show that the creditors have received through the allotted securities payments on their claims in excess of their face, but there is no allegation of a radically improved situation as to this railroad's earnings available for interest.[7] Although distortions of income available for interest from varying causes do appear in the reports of the Trustees, available interest is an important figure as a basis for the consideration of capitalization. Traffic comparisons are not specifically set out.[8] While the allegations of a petition for

---

[7] The annual reports of the Trustees to stockholders show the income available for interest as follows:

| | |
|---|---|
| 1942 | $17,044,420.39 |
| 1943 | 11,573,667.94 |
| 1944 | 8,157,880.25 |
| 1945 | 1,503,289.07 Dr.* |

In 1946 the income available for all fixed charges at the end of eleven months was $3,405,118.00.

*This deficit is shown after deducting from gross earnings a tax accrual for prior years of $3,648,589.63 (in addition to the tax accrual for the year 1945) and $12,790,657.50 in amortization of war facilities.

[8] Revenue freight carloading weekly report of American Association of Railroads shows car loadings for the month of December for the years 1941 to 1946 as follows:

| | | | |
|---|---|---|---|
| 1941 | 14,045 | 1944 | 15,308 |
| 1942 | 16,915 | 1945 | 12,007 |
| 1943 | 14,571 | 1946 | 13,517 |

re-examination into a confirmed railroad reorganization plan need not contain allegations of the primary facts, the allegations should allege ultimate facts, such as those just referred to, sufficient to indicate the factual basis for a re-examination. The allegations of changed conditions in this petition to the District Court do not have the specificity of those which caused this Court in 1932 to direct an injunction against a Commission order of 1930 that was based on hearings that antedated the depression, beginning in 1929.[9] The ruling in that case has not been extended to authorize the reopening of hearings before the Commission because of alleged changes in conditions. For cases of that type, this Court has pointed out, there must be a showing of substantial injury.[10] We have approved a statement that the *Atchison* case rested upon exceptional facts.[11]

To open a confirmed plan of railroad reorganization, assuming the power to do so, accepted after years of consideration, requires a showing by allegation of injustice to the complaining debtor or junior creditors far stronger than any here made. Compare *Pewabic Mining Co.* v. *Mason*, 145 U. S. 349, 356, 367; *Group of Investors* v. *Milwaukee R. Co.*, 318 U. S. 523, 543.

Much of what we have written is directed at the suggestion that there should be a plenary re-examination of reorganization proposals for the Denver & Rio Grande. As to that suggestion, we are of the opinion that the record affirmatively shows a proper basis for the valuation and allocation of securities by the Commission, 328 U. S. 495, 502–503, and that the record fails to show any sound

[9] *Atchison, Topeka & Santa Fe Railway Co.* v. *United States*, 284 U. S. 248, 256.

[10] *United States* v. *Northern Pacific Railway Co.*, 288 U. S. 490, 494.

[11] *Interstate Commerce Commission* v. *City of Jersey City*, 322 U. S. 503, 515.

basis for a re-examination on account of changed circumstances between May, 1941, and June 10, 1946.

So far as the period since June 10, 1946, is concerned, there is no basis in this record or in anything judicially known to us for a conclusion that there has been a significant change in interest rates, earnings available for interest or traffic. Nor do we see that the action of Congress in passing S. 1253, on July 31, 1946, should persuade us to require a stay to await further enactments that might affect this reorganization. It was vetoed. President's Memorandum of Disapproval, August 13, 1946. Our understanding of our duties under the Railroad Reorganization Act, in the face of strong criticism of its provisions, was expressed in the former review of this plan, 328 U. S. 495, 509, 510. It need not be repeated. We must continue to act under the now existing law. Whether or not changes may be made that will effect this reorganization, we do not know. It is quite understandable to us that stockholders strive to preserve the equities of their investments and that creditors should feel, in this case, that they have not recovered the value of their investment. Such convictions are to be respected.

The suggestion is made that there is a public interest in what persons or corporations hold in the future a controlling voice in the management of this railroad. This matter had the consideration of the Commission, 254 I. C. C. at 367 et seq. The plan adopted contains a ten-year voting trust for the new stock with Commission-regulated provisions for its sale. 254 I. C. C. at 400. The record does not present any ground for concluding that the new owners will be any the less solicitous for the public welfare than those who, at present, hold the stock certificates.

However, nothing before or since the confirmation of this plan indicates any disregard by the Commission or the courts of the interest of operators, stockholders, the

creditors or the public. When the Interstate Commerce Commission finds the value of a railroad system by any means, the correctness of the result cannot be mathematically proved or disproved. The difficulties of appraisal are multiplied by the necessity of looking into the future to estimate earnings. Earnings estimates are made with allowance for changing economic conditions. So are interest rates. All this is recognized by everyone; but the Commission has found no better way to determine the allocation of new securities among the various classes of stockholders or of creditors of a railroad with their different rights. Cf. *Reconstruction Finance Corp.* v. *Denver & R. G. W. R. Co.*, 328 U. S. 495, 505–509.

The reorganization should be carried out. The order of the Circuit Judge in directing a stay of the consummation of the plan is vacated and the order of the District Judge of October 30, 1946, denying the petition is affirmed.

MR. JUSTICE FRANKFURTER, dissenting.

Formally, this is a litigation between private litigants, creditors quarreling over their share in the capitalization of a reorganized enterprise. Intrinsically, the case concerns issues of serious public importance. Control of one of the major railroad systems of the country is at stake. Disposition of the controversy brings into play considerations of policy on which the Congress and the President have clearly expressed themselves with relevance to the problem before the Court.

The peculiar and controlling public aspect of the case is emphasized by the position taken by the Government. The Government frequently intervenes as *amicus curiae* in so-called private litigation to present the dominant public aspects of such litigation. In the earlier stages of this litigation the Government was in fact a party of record. Through one of its agencies, the Reconstruction Finance Corporation, the Government is itself a creditor. When

the plan for reorganization, now ordered to be carried out, was found by the Circuit Court of Appeals not "fair and equitable," and justifiably rejected by the general bondholders whose claims constituted about one-fourth of the entire debt of the railroad, the Government here joined the present petitioners in urging reversal of that decision and approval of the plan. See 150 F. 2d 28, and 328 U. S. 495. After such reversal here, the case went back to the District Court and the present proceedings were begun for re-examination of the plan. The District Court dismissed these proceedings, but an order by the Circuit Court of Appeals stayed the execution of the plan until the court had opportunity to consider an appeal duly docketed. When a petition for certiorari was filed here to lift the case out of the Circuit Court of Appeals before it could be heard, the Government no longer asked this Court to approve the plan which it had supported here last March. Instead, the Government bowed itself out of the case. What has happened to make the Government abstain from standing on the decision which it obtained here last June? That which has happened constrains me to the view that the Denver and Rio Grande reorganization plan calls for further scrutiny, and should not, as matters now stand, be carried out.

What has happened since this Court rendered its decision last June? The Government, in its memorandum of abstention, states it succinctly and with candor:

> "Because of the action of the Congress last Summer in passing the Bill known as S. 1253 and the reasoning of the President's Memorandum of Disapproval, dated August 13, 1946, both of which indicated disapproval of certain features of railroad reorganizations approved pursuant to the provisions of Section 77 of the Bankruptcy Act, which is the existing law, the RFC, as an agency of the United States created

and existing by virtue of Congressional enactment, is not taking any position as to whether the petitions should be granted."

The decisive change in relevant circumstances, which thus caused a decisive change of position by the Government since the case was here originally, is the essential basis for the debtor-railroad's unsuccessful effort in the District Court to secure re-examination of the reorganization plan, and was presumably the basis for the order of Judge Phillips in the Circuit Court of Appeals staying proceedings in the District Court to consummate the plan.

This controlling change in circumstances is dismissed by the Court with the observation that "the action of Congress in passing S. 1253 . . . was vetoed. President's Memorandum of Disapproval, August 13, 1946." But the decisive consideration is not that the President vetoed the bill but why he vetoed it. The President left no doubt regarding the grounds of his veto. In the interest of an adequate appreciation of them the full text of his Memorandum is made part of this opinion (Appendix I). The President did not veto the bill because he disapproved its purposes. He vetoed the bill because it was too weak, in some of its provisions, for carrying out those purposes. "By withholding my signature to this bill," wrote President Truman, "I do not intend to indicate that I favor the pending reorganization plans. I am in agreement with those objectives of the bill which prevent undesirable control of the railroads, either immediately or within a few years, and which prevent forfeitures of securities." He continued: "I believe that the next Congress can pass a bill which will meet the stated objections and which will be in the best interests of the public, the railroads, the bondholders and other creditors, and the stockholders." These are not merely the views of the President of the United States. They are the views of a President with expert

knowledge of the subject, gained through years of active participation in the most elaborate investigation of railroad reorganizations ever conducted by a Congressional committee.

The President's veto statement elicited a prompt response from leaders of the Conference Committee out of which the vetoed bill came. They represented both Houses and both parties. The statement deserves quotation in full:

### "Statement of Members of Congress Regarding Further Legislation

"The railroad reorganization bill, S. 1253, was the culmination of over 3 years of intensive effort to save $2,000,000,000 of investments made by hundreds of thousands of stockholders and junior bondholders in railroads now in process of reorganization under section 77 of the Bankruptcy Act. Those investments will be wiped out under pending plans of reorganization unless legislation is enacted to prevent it. This bill was designed and passed by the Congress primarily for that purpose.

"Those who have supported this legislation will be definitely heartened by the declaration of principles contained in the President's memorandum stating why he withheld his signature from the bill. For it is clear that the broad principles announced by the President are shared by the proponents and supporters of this legislation. Broadening of the bill to meet the requirements of the President's objections can and will be drafted. Such a bill will be promptly introduced at the next session of the Congress. As Congress has already overwhelmingly committed itself to such legislation and the President has declared that he, too, favors its purposes, the prompt enactment of such a measure appears certain.

"While this legislation was under consideration in the committees of the Senate and House, a number of courts and the Interstate Commerce Commission recognized the appropriateness of cooperating with Congress in meeting this public problem and abstained from taking steps which would have carried forward any of the pending reorganization plans under section 77. This was months before the legislation came up for a vote in either the Senate or House. Now that the legislation, both in the form in which it was reported by the respective committees of the Senate and House and in the subsequent form contained in the conference report, was passed by an overwhelming vote in each Chamber and the objectives of the legislation have received the approbation of the President, it is confidently hoped that the courts and the Commission will take no steps in support or furtherance of pending reorganization plans under section 77, but will instead await action by the Congress and the President on legislation giving effect to the principles favored by both.

> CLYDE M. REED.
> JAMES M. TUNNELL.
> SAM HOBBS.
> CHAUNCEY W. REED.

Washington, D. C.,
  *August 14, 1946.*"

It is difficult to believe that had the President signed S. 1253 this Court would have sustained the action of the District Court in dismissing out of hand the petition for re-examination of the reorganization plan. The considerations of public policy which underlay that measure could hardly have been disregarded, for the inequities of this very reorganization plan were extensively cited in Congress as demonstrating the need for correction.

This would have been so although Congress did not see fit to withdraw entirely the further jurisdiction of the District Court in these reorganization proceedings. But the grounds of the President's veto only emphasize these considerations of public policy. They should prompt a court of equity to stay its hand until further scrutiny of the plan. The bi-partisan statement of the conference leaders underwrites the President's formulation of public policy. Of course, neither the President's hopes nor the confidence of Congressional leaders insures legislation. But if the realization of the desires of the President and the expectations of bi-partisan Congressional leaders concerned with this legislation would affect, as I cannot believe it would not, the action of a court of equity when asked to enforce this reorganization plan, the Court ought not to proceed on the assumption that the legislation as outlined by the President will not be forthcoming.

We are dealing here not with an ordinary litigation as to which courts are exercising conventional judicial authority. The courts are carrying out the legislative mandate of Congress as to the considerations of public policy by which the role of the judiciary in railroad reorganization should be guided. The primary responsibility is lodged with an agency of Congress, the Interstate Commerce Commission. This Court's jurisdiction is at once very limited and novel. If legislation which would make it the duty of the Court to reconsider the reorganization plan now before us is really in prospect, only the most imperative public emergency should require this Court to engage in a race with the President and Congress in the disposition of questions of public policy. *Cf. Pennsylvania* v. *Wheeling and Belmont Bridge Co.*, 13 How. 518, and 18 How. 421.

Moreover, Congressional intention has not been latent and conjectural since last summer. Legislation, as sug-

gested by the President, appears to have every prospect of prompt consideration in the new Congress. In submitting a joint bi-partisan resolution (see Appendix II of this opinion) dealing with railroad reorganizations, after referring to the President's Memorandum of Disapproval and the Statement of Members of Congress Regarding Further Legislation, *supra,* Senator Reed stated that

> "preliminary discussions have already been agreed to with Members of the House, with a view to expediting this legislation in the Eightieth Congress. It is hoped that it can be taken up, in a preliminary stage, with the White House so that the greatest possible speed can be secured for the legislation to be finally enacted in the Eightieth Congress."

The Court rightly assumes that neither this Court nor the District Court is concluded by what was decided here last June. Changed circumstances, of course, may require the re-examination of a plan by the Interstate Commerce Commission. First and last, this is a proceeding in equity, and until a decree consummating a plan of reorganization is finally signed it is the duty of a court of equity not to make of itself an instrument of inequity. Peculiarly is this so where the paramount interest is that of the public, though the formal litigation is carried on by private parties. In such a situation we are not restricted to the specific claims of the formal litigants. We are not restricted to the limited specific financial factors which, in the debtor's opinion, have affected the situation since last June. The decisive issues are those posed by the Congress and the President. The real question before the Court is whether, in the light of events since its prior decision, there is a solid basis for the judgment which we are asked to enforce. To be sure, even in a court of equity a matter once adjudicated should not be relitigated even though the litigation is still open, as it always is until

there is a final decree. Usually reconsideration of an interim determination because of "changed conditions" implies new events in nature. But new understanding of old facts or hitherto unexplored relevant facts may constitute the most significant kind of change in circumstances.

The essence of the matter before the Court is this. We are asked to give our imprimatur to a plan of far-reaching implications to the public interest, in that it concerns the control of one of the major railroad systems of the nation. That plan was born of the confused uncertainties of the war years, after a long period of incubation and many changes. Judgment often involves prophecy, and all prophecy has an element of guesswork. But guessing can be less rather than more. How much guesswork is involved in this plan has been candidly indicated by members of the Interstate Commerce Commission. To expect a "normal" period, in the sense of assured stability, for a good stretch ahead is doubtless to pursue a will-o'-the-wisp. But the President's message pointed to factors to which certainly no adequate attention has thus far been paid in these proceedings.

The President spoke of the "evil, present in reorganizations under section 77, of permitting improper control of railroads after their reorganization." Repeatedly he referred to this vital aspect of the public interest, the protection of which requires "that reorganizations shall place control of railroads in persons primarily concerned with transportation for the communities served and for the nation as a whole, without any strings direct or indirect, conditional or otherwise, to institutions or others in distant financial centers."

Here is certainly a matter of prime relevance in ascertaining whether this reorganization plan should be given final judicial sanction. The control of this major railroad system is to pass into the hands of the so-called insurance

group in New York and its two largest lending national banks. The directions in which insurance companies have in the past exerted their power over the railroads of the country are not calculated to give confidence in future control by them. The geographical and functional remoteness of powerful financial interests in New York, in relation to a railroad system operating in Colorado and Utah, bars that single-minded attentiveness and pioneering enterprise which characterized great railroad men like Edward H. Harriman, James J. Hill and Daniel Willard.

Another ground of President Truman's dissatisfaction with S. 1253 was its failure to deal adequately with the "grossly excessive interest rates now wasting the funds of the railroads in section 77 proceedings." To be sure, the Interstate Commerce Commission was not unmindful of the present low interest levels when it approved the 1943 reorganization plan. It is safe to say, however, that the significance of the sharp drop in interest levels has recently been made more manifest and further inquiry would lay it bare.

Finally, the President seemed much concerned by needless forfeitures under reorganization plans. In all discussions in Congress, the plan before us was given as a conspicuous example. The avoidance of forfeitures does not involve large capitalizations. It is to be avoided in other ways, such as calling for tenders of bonds by bondholders and their purchase by court trustees at the below-par prevailing market prices.

On two of these important aspects of sound financing in railroad reorganizations, proper interest rates and what has been called "the painless reorganization of the railroad debt structure," (see speech of Senator Vandenberg, August 3, 1939, 76th Cong., 1st Sess., 84 Cong. Rec. 11127), the record here is slender indeed, if not barren.

Here are lines of crucial public interest to which the Congress and the President have called authoritative at-

tention since the case was last here.   These are matters on which the Court should satisfy itself on its own initiative whether or not private litigants have adequately presented them.   The Court is not passing merely on specific issues framed by the parties or on the narrow claims on which the parties press for reconsideration.   Abstractly, no one will reject what the President has called the principle that "reorganizations must give primary consideration to the public interest."   But that public interest is in the keeping of the courts.   It must be safeguarded by them without regard to the manner in which those who have also private interests represent the public interest.

And what consideration is more compelling than that this reorganization be re-examined by the Interstate Commerce Commission in the light of the vast changes of the transforming six years since the Interstate Commerce Commission closed its record in this case, particularly in light of the scrutiny which these reorganizations have received from the Congress and the President since this Court last considered the case?   There is no suggestion that the interests of the railroad, or the public that it serves, or its creditors, will suffer by the delay necessary to explore further these basic issues before turning its control over to distant financial institutions.   No one has suggested that this railroad has not served the public effectively while under court control, or that it cannot continue to do so until full inquiry dissipates the heavy clouds of doubt resting over this reorganization.   To be sure, the road has been in reorganization since 1935.   But it took four years for the formulation of the first reorganization plan and another four to formulate the additional plans. What Judge Learned Hand recently said of another situation is here applicable: "there can be considerations more imperative than the despatch of judicial business, even after delays so long as existed in this case.   If the legally protected interests of any opposing parties are fully pre-

served, it is not a good reason to deny others any reasonable chance to protect their own interests that they have been long in asserting them." *Knight* v. *Wertheim & Co.,* 158 F. 2d 838, 844. Surely the protection of the public interest in the special keeping of the Court is more imperative than the despatch of judicial business, and no legally protected interest of those to whom the financial control of this road has been awarded can possibly suffer by full inquiry as to whether the paramount public interest has been properly safeguarded.

## APPENDIX I.

### MEMORANDUM OF DISAPPROVAL.

I am withholding my approval of S. 1253, entitled "An Act to enable debtor railroad corporations, whose properties during a period of seven years have provided sufficient earnings to pay fixed charges, to effect a readjustment of their financial structures; to alter or modify their financial obligations; and for other purposes."

Even though I am familiar with the deficiencies and inequities and the evils that exist under section 77 of the present Bankruptcy Act, I fear that this new bill would not accomplish the purpose for which it was intended.

The bill contains two sections, the first of which contemplates the prevention of bankruptcy proceedings where practicable; the second contemplates the reorganization of certain railroad carriers by the institution of proceedings under section 1 of the bill for readjustment of their financial affairs.

Objections which I have to the bill include the following:

The bill fails to direct specifically the immediate reduction of the grossly excessive interest rates now wasting the funds of the railroads in section 77 proceedings. Millions of dollars per year can be saved at once for each of

the railroads in section 77 proceedings, by reducing the interest rates on their bonds and other debt down to the level of the interest rates paid by railroads not in section 77 proceedings. I reiterate a statement which I made in my message to Congress on the state of the Union which is as follows, "low interest rates will be an important force in promoting the full production and full employment in the post-war period for which we are all striving."

The bill does not adequately cure the evil, present in reorganizations under section 77, of permitting improper control of railroads after their reorganization.

The bill fails to provide full protection against forfeiture of securities and investments.

The level of fees and expenses in reorganization cases under section 77 has been excessive. This is not corrected in this bill. Affirmative provisions to curb this evil and to bring it under strict control should be included in any bill which may be enacted.

The bill excludes from its benefits certain railroads which should be brought within its provisions if it is to become law. In this regard it appears that the fifty million dollar limitation in section 2 of the bill would exclude some railroads for whose exclusion there appears to be no logical justification.

This bill fails to correct a serious abuse which I condemned in the course of the Senate railroad investigation. I refer to the abuse of diverting, under cover of a reorganization plan, the funds of a railroad for the purchase of its own stocks in the market.

On the other hand, the bill does incorporate principles for which I was one of the sponsors in the Senate. I commend particularly the emphasis which the bill places on the principle that reorganizations must give primary consideration to the public interest, and to the best interests of the railroads which are being reorganized.

This requires among other things that reorganizations shall place control of railroads in persons primarily concerned with transportation for the communities served and for the nation as a whole, without any strings direct or indirect, conditional or otherwise, to institutions or others in distant financial centers.

Such regard for the public interest will also help the stockholders, whether they be railroad employees who have invested in the stocks of the companies for which they work, or ordinary investors, desirous of safeguarding their investment, but not of helping any interest to capture control of their railroad.   These stockholders, whom the bill justly seeks to protect against forfeiture, can and should get such protection, but without enabling any financial interest to use such legislation to acquire control.

By withholding my signature to this bill I do not intend to indicate that I favor the pending reorganization plans. I am in agreement with those objectives of the bill which prevent undesirable control of the railroads, either immediately or within a few years, and which prevent forfeitures of securities.

I believe that the next Congress can pass a bill which will meet the stated objections and which will be in the best interests of the public, the railroads, the bondholders and other creditors, and the stockholders.

HARRY S. TRUMAN

THE WHITE HOUSE,
*August 13, 1946.*

## APPENDIX II.

(S. Res. 65, 80th Cong., 1st Sess., Jan. 22, 1947, Cong. Rec. p. 543.)

Whereas many railroads in the continental United States are in the hands of receivers and trustees because

of insolvency proceedings brought under section 77 of the Bankruptcy Act, or through equity court procedure; and

Whereas the mileage of these railroads is approximately forty thousand, and the investment in road and equipment amounts to several billion dollars; and

Whereas many of these roads entered bankruptcy in 1933, 1934, 1935, or 1936, 10 to 14 years ago, and the earnings of these roads in recent years have been sufficient to accumulate large cash amounts, and have placed such roads in a solvent position; and

Whereas, according to the best information available, court proceedings involving some very important railroads are in such a condition that it is difficult if not impossible to approximate the time when reorganization under section 77 will be completed, and it is feasible for a number of these roads to retire part of their indebtedness, at a discount, and to refund or extend the maturity date of the balance of their indebtedness, and it further appears desirable to discharge such railroads from bankruptcy proceedings without the necessity of drastic reorganizations under section 77; and

Whereas the continued holding of roads that have become solvent in trustee or receiver operation as insolvent roads, and further efforts to reorganize, under section 77, railroads which no longer need such reorganization, are contrary to the general public interest and contrary to sound public policy; and

Whereas the President of the United States has joined with Congress in going on record in favor of modifications of present reorganization legislation and in favor of the principles proposed by the appropriate committees of the Senate and House of Representatives in 1946, and in favor of the principles enacted by Congress in 1946, and the President has further urged the strengthening of such pro-

posals and the adoption of further provisions to carry out those general principles: Therefore be it

*Resolved,* That the Committee on Interstate Commerce of the Senate is authorized and directed either as a committee, or through a duly constituted subcommittee, to make an investigation of the conditions surrounding the operation and handling of said railroads by trustees and receivers through the period of receivership or trusteeship; to ascertain the extent to which there should be elimination or reduction of any of the exceptions heretofore proposed to legislation on this subject; to inquire into the causes for the failures, (a) to reduce the interest rates of railroads in receivership and bankruptcy proceedings; (b) to arrange for the reduction of the rates of interest payable by such railroads on their outstanding indebtedness; (c) to arrange for the refunding and extension of maturity dates of part or all of the indebtedness of such railroads while in the hands of the courts; (d) to call for the tender of bonds and the purchase of bonds of such railroads either at a discount or otherwise, by the receivers or trustees, out of funds in their hands; (e) to discharge such railroads from court proceedings without the necessity of being subjected to drastic reorganization under section 77 of the Bankruptcy Act; and (f) to return such railroads to their owners as promptly as possible; to investigate the fees paid trustees, receivers, counsel, bankers or bank syndicates, committees and experts, and any and all matters relating thereto, and to ascertain the methods of reducing reorganization expenses and the possibility of eliminating, by discharge of railroads without further reorganization proceedings under section 77, the necessity for any further reorganization expenses under elaborate and therefore costly reorganization proceedings; to ascertain what legislative methods can be provided to enable railroads now undergoing reorganization to obtain management local to

636

their lines of operation and to the communities, shippers, and passengers they serve, and to enable the owners of such railroads to secure control free from domination by interests which have not received the affirmative and express vote of the security holders subsequent to reorganization; to ascertain what voluntary methods and steps additional to those proposed in legislation adopted by the Seventy-ninth Congress on this subject will be useful in expediting the discharge of railroads from costly bankruptcy and reorganization proceedings without the necessity of drastic reorganizations under section 77, and to permit reorganization by voluntary proceedings in a businesslike manner and on a businesslike basis; to ascertain what methods and procedures, additional to those provided in legislation passed by the Seventy-ninth Congress on this subject, will be useful for the protection of railroad employees and other investors in the stocks of the railroads. The committee is directed to report to the Senate as early as practicable, with such recommendations as to changes in existing law as may be found desirable.

For the purposes of this resolution, the committee, or any duly authorized subcommittee thereof, is authorized to hold such hearings, to sit and act at such times and places during the sessions, recesses, and adjourned periods of the Eightieth Congress, to employ such clerical and other assistants, to require by subpena or otherwise the attendance of such witnesses and the production of such correspondence, books, papers, and documents, to administer such oaths, to take such testimony, and to make such expenditures, as it deems advisable. The cost of stenographic services to report such hearings shall not be in excess of 25 cents per 100 words.