**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re CONFIRMATION AND CONSUMMATION OF PLAN OF REORGANIZATION.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

Aug. 17, 1978.

See also, D.C., 458 F.Supp. 1346.

Charles A. Horsky, Brice Clagett, Washington, D. C., James E. Howard, Philadelphia, Pa., Philip Stansbury, Washington, D. C., Carl Helmetag, Jr., John J. Ehlinger, Jr., Philadelphia, Pa., for Penn Central Trustees.

Leon Leighton, New York City, for Minority Stockholders of Mahoning Coal Railroad.

David Berger, P. A., by David Berger, Philadelphia, Pa., for Penn Central Co.

Tyler & Reynolds by H. Theodore Cohen, Boston, Mass., for Charles S. Jeffrey.

Edward I. Dobin, Morrisville, Pa., for Bank of New Jersey, Indenture Trustee.

Walsh & Frisch by Jerome K. Walsh, New York City, for Certain Leased Lines.

Goodman & Ewing by Joseph J. Connolly, William H. Ewing, Philadelphia, Pa., for Certain Secondary Debtors.

Clark, Ladner, Fortenbaugh & Young by Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

Sullivan & Worcester by Joseph Auerbach, Morris Raker, Boston, Mass., Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for New Haven Trustee.

Kelley, Drye & Warren by Stephen Green, New York City, for Manufacturers Hanover Trust Co.

Ballard, Spahr, Andrews & Ingersoll by Frederick L. Ballard, Philadelphia, Pa., for Schedule A Trustees, Girard Trust Bank.

Schnader, Harrison, Segal & Lewis by David S. Hope, Gilbert W. Oswald, Philadelphia, Pa., for Penn Central Co.

Pepper, Hamilton & Scheetz by Laurence Z. Shiekman, Teresa R. Novick, Philadelphia, Pa. for Consolidated Rail Corp.

Douglas G. Sanborn, Deputy Atty. Gen., Trenton, N. J., for State of New Jersey.

Grant G. Guthrie, Wilnetta S. Marks, Washington, D. C., for Securities & Exchange Commission.

Wolf, Block, Schorr & Solis-Cohen by Michael L. Temin, Philadelphia, Pa., for First Pennsylvania Bank N. A. as Indenture Trustee.

Reed, Smith, Shaw & McClay by Andrew N. Farley, Philadelphia, Pa., for Mellon Bank, N. A.

Shearman & Sterling by George J. Wade, Robert H. MacKinnon, Kenneth M. Kramer, Michael K. Diana, New York City, for Citibank, N. A. as Agent for the Committee of Secured Bank Creditors.

Willkie, Farr & Gallagher by Louis A. Craco, New York City, for Friday Group and Institutional Investors Penn Central Group.

Rogers & Wells by Donald F. Luke, New York City, for Committee of Interline Railroads.

John H. Broadley, U. S. Dept. of Justice, Washington, D. C., for United States.

Richards, Layton & Finger by Richard G. Elliott, Jr., Wilmington, Del., for Wilmington Trust Co., Successor Indenture Trustee.

Winthrop, Stimson, Putnam & Roberts by Stephen A. Weiner, New York City, for Irving Trust Co.

Proskauer, Rose, Goetz & Mendelsohn by Larry M. Lavinsky, Philip M. Hahn, New York City, for The Bank of New York, as Indenture Trustee.

Richard H. Stokes, Jamaica, N. Y., for Long Island Rail Road Co.

Bruce C. Fishelman, Jersey City, N. J., for City of Jersey City.

Al Blase, for various bondholders.

Dahlberg, Mallender & Gawne by J. Donald McLeod, John J. Iseman, Birmingham, Ala., for Manufacturers National Bank of Detroit, Successor Indenture Trustee.

Burgess, Fullmer, Parker, Steck & Andrews by Earl J. Krock, Cleveland, Ohio, for Kalamazoo, Allegan & Grand Rapids.

Margaret Anne Foster, Cleveland, Ohio, for Board of Education, Cleveland School District.

Dechert, Price & Rhoads by F. Hastings Griffin, Jr., Philadelphia, Pa., for National Railroad Passenger Corp.

White & Case by Robert W. Mannix, New York City, for Bankers Trust Co., Indenture Trustee.

Harvey Strickland, for Bankers Trust.

## OPINION AND ORDERS RE CONFIRMATION AND CONSUMMATION OF PLAN OF REORGANIZATION

FULLAM, District Judge.

On March 17, 1978, this Court approved, subject to certain modifications, the Plan of Reorganization proposed by the Penn Central Trustees and separate Plans for each of the 15 Secondary Debtors[1] (the 16 Plans will be referred to as the Plan). Order No. 3279 directed that a ballot, and a copy of the Plan, this Court's Opinion, the SEC's Advisory Report and supplement thereto, and other pertinent information be distributed to the parties entitled to vote on the Plan. By overwhelming majorities, all classes of creditors, save three classes of stock of the Pittsburgh, Fort Wayne & Chicago Railroad, accepted the Plan. For example, claimants holding $1.003 billion in Class J secured claims (99.4%) voted for acceptance, while claimants holding $5.570 million (.6%) voted to reject the Plan.

A number of appeals have been taken from this Court's Approval Order,[2] briefing has been completed, and the Court of Appeals will hear oral argument some time during the week of October 16, 1978.

The two petitions before the Court (Doc. Nos. 15716 and 15931) raise four separate

---

1. *In re Penn Central Trans. Co.*, 458 F.Supp. 1234 (E.D.Pa.1978). Hereinafter cited as the *Approval Opinion.*

2. The relief requested by the principal appellants is set forth in the Appendix.

questions: Should the Plan be confirmed; What date should be fixed for consummation of the Plan; Are the documents pertaining to the reorganized company and its securities in proper form in all respects; What terms should be included in the Consummation Order? The parties have had an opportunity to state their positions with respect to these questions at a hearing held on July 27, 1978.

## A. CONFIRMATION

### 1. *Objections*

■ Under § 77(e) of the Bankruptcy Act, a plan which has been approved by the reorganization court and has received the required favorable vote of those entitled to vote should be confirmed, unless it is established that, in the interim, circumstances have changed in such a way as to undermine the basis of the court's earlier approval of the plan. *Insurance Group Committee v. Denver, Rio Grande & Western R.R. Co.,* 329 U.S. 607, 67 S.Ct. 583, 91 L.Ed. 547 (1947). For the most part, those now objecting to confirmation of the Plan have merely restated the legal arguments previously rejected by this Court in its *Approval Opinion.* The one exception is Bankers Trust Company, as Indenture Trustee of the Consolidation Mortgage, which has, at least in a sense, asserted that circumstances have in fact changed.

Bankers Trust originally objected to the way in which the Trustees were allocating retained asset security to the various mortgages, claiming that, as a result of crediting all of the value of the Harlem properties to the reversion, rather than assigning an appropriate value to the leasehold interests of the Debtor, the Consolidation Mortgage it represented was being shortchanged. Upon further analysis, the Trustees agreed, and made adjustments which had the effect of attributing some $29 million more in retained assets to the Consolidation Mortgage. Bankers Trust thereupon withdrew its objections, and supported the Plan during the approval proceedings, but expressly reserved the right to withdraw its support, and to oppose the Plan, if the Plan as finally approved by the Court accorded to any other mortgagees better treatment than the basic 10–triple–30 treatment proposed by the Trustees for all mortgages.

As originally proposed, the Plan provided for only one class of preference stock. However, in approving the Plan, this Court directed that there be two series of preference stock, Series A and Series B, and that four designated mortgages should receive Series A preference stock, whereas all other bondholders are to receive Series B. Series A preference stock is to be redeemed before the Series B preference stock. It is this modification of the Plan in the *Approval Opinion* which Bankers Trust apparently relies upon as a "changed circumstance," justifying denial of confirmation.

Although the *Approval Opinion* does not specifically deal with the possibility that the Consolidation Mortgage should be included within the group to receive Series A preference stock, it does discuss, and reject, the argument that the Lake Shore and Michigan Central Collaterals should be included in that group; and their claims to inclusion *vis-a-vis* the Consolidation Mortgage are stronger. In other words, non-inclusion of the Consolidation Mortgage follows *a fortiori* from denial of that status to the Lake Shore & Michigan Central Collateral Mortgages.

Under the 10–triple–30 distribution scheme as originally proposed, mortgages with retained asset coverages of 100% receive the same package of securities (30% A Bonds; 30% preference stock; 30% common stock) and 10% in cash as mortgages with retained asset coverages of more than 100%. This fact led a number of Indenture Trustees to use the term "super secured" to describe the fact that their mortgages had retained asset coverages exceeding 100%. Three lines of argument were pressed by the super secureds in support of their contention that their mortgages were entitled to some form of better treatment under the Plan. The *Approval Opinion* discussed each of these arguments and rejected them.

The first argument is that because the 10–triple–30 distribution accords the same treatment to those mortgages which are secured by retained assets in excess of 100%

as to those mortgages which have only 100%–retained asset coverage, the Plan is not fair and equitable, by reason of the failure to recognize the excess retained asset coverage. After a thorough analysis of the operation of the 10–triple–30 distribution scheme and consideration of an alternate distribution scheme, I concluded that even with respect to mortgages having retained asset coverage of as high as 275%, the 10–triple–30 distribution was fair and equitable.[3]

A number of super secureds which made this argument had no first liens on any retained assets. Their super secured status came about only because of the marshalling of asset values down from higher liens. This is true in the case of the Consolidation Mortgage. It has the third lien in a four-step sequential mortgage chain: First, the 013 Gold Bond Mortgage; second, the 014 Lake Shore & Michigan Central Collaterals; third, the 014 Consolidation Mortgage; and, fourth, the 015 R & I Mortgage. Any increase over the $29 million allocated by the Trustees to their leasehold interest in the Harlem would in the first instance be credited to the 013 Gold Bond Mortgage. For the purposes of considering whether the 10–triple–30 distribution is defective because it ignores retained assets in excess of 100%, it is necessary to look to first lien assets only. This is so because any other procedure results in a double count of the same retained asset values. For example, assume that there are three sequential liens each securing a claim of 100 units, and that there are 243 units of security. Lien 1 is 243% secured. If lien 2 is entitled to better treatment on the theory that it has 143 units of security then lien 1 would no longer be over-secured. If both liens got better treatment, each would be relying on the same asset values. In the context of an argument focused on the "disparities" of treatment, it is the first lien which would

have the full benefit of the excess security.[4] We are dealing here in *comparisons*. If we compare two disparate piles of sand, we do not shovel sand from one pile to the other in the midst of the process. Under this analysis, the Consolidation Mortgage is in the same position as the Lake Shore Mortgage—both have zero first lien retained asset coverage. Of course, the Consolidation Mortgage is not entitled to better treatment if others with higher retained asset coverages are not.

Next, some of the super secureds argued that in liquidation their mortgages would fare better than those with 100% or less in retained asset coverage and therefore the Plan was not fair and equitable because the distribution scheme did not reflect the more favorable results on liquidation. In considering this argument, both first and second liens on retained assets were given weight and the full value of the Harlem lease was considered as at least potentially available to the Gold Bond, Lake Shore, Michigan Central, and Consolidation Mortgages. By and large, this argument was rejected because it was predicated on an over-simplified model based exclusively on "best case" assumptions. The principal liquidation scenario presented and rejected was that of the Lake Shore Collateral. It follows that the Consolidation Mortgage, which is subordinate to the Lake Shore Collateral, is in no better position.

Finally, it was argued that the equitable equivalence doctrine was violated by the 10–triple–30 distribution. The main thrust of this argument was directed to the Trustees' assumption that the estate was solvent and that unsecured and equity interests may participate. The Plan also withstood this challenge. Obviously, the Consolidation Mortgage falls within that conclusion.

It was only after consideration of these arguments that creation of two classes of

---

**3.** At the risk of over-simplifying what was a recurring theme in the *Approval Opinion*, the main reason for this conclusion is that the Plan makes possible the deferral of administration claims and has other advantages, proper allocation of which is not necessarily related to the retained-conveyed dichotomy.

**4.** It is essential to bear in mind that because administration expenses are under the Plan partially satisfied in cash on consummation, or shortly thereafter, the amount of retained assets available for distribution is substantially less than the total amount of retained assets subject to the liens of the respective mortgages.

preference stock was introduced. The detailed analysis of the super secureds' arguments led to the conclusion that within the class of those asserting super secured status there were such substantial differences in retained asset coverage that some form of better treatment of the most highly secureds might be appropriate. For example, the Mohawk & Malone and the Gold Bond Mortgages have first lien retained asset coverage of 275% and 243%, respectively. When this is compared with the retained asset coverage of other super secureds, for example, the Boston & Albany and the Michigan Central Collateral which have first lien retained asset coverages, respectively, of 115% and 116%, and with the retained asset coverages of the other mortgages, the magnitude of the difference is quite clear. That magnitude of the difference is relevant in and of itself, and also because the exceedingly high retained asset coverage makes it more likely there might be a sufficient cushion of retained assets to absorb administration claim assessments in liquidation. Because of the amount of the administration claims, no cushion would be provided by second lien asset values. Concededly, in drawing from the differences in retained asset coverages the conclusion that some better treatment was appropriate, the previously rejected arguments of the super secureds were in a sense partially adopted. The question posed, however, was significantly different: Did the substantial differences in the retained asset coverages of the various mortgages justify a modification of the Plan which did not do violence to the feasibility of the Plan but at the same time made the Plan more fair and equitable. The division of the preference stock into Series A and B is a modification which meets that specification, and the Plan, in my judgment, is made more fair and equitable by the recognition of the very high percentage of retained assets of the Mohawk & Malone and the Gold Bond Mortgages.

Also included within the group of mortgages to receive Series A preference stock are two Collateral Trusts secured by the stock of the Pittsburgh & Lake Erie Railroad. The retained asset coverages of these Collateral Trusts are approximately 119% and 131%. Inclusion of these Collateral Trusts within the group to receive Series A preference stock was not based exclusively on the retained asset coverage. Rather, I also gave weight to the fact that these mortgages were secured by non-operating property. Irving Trust, the Indenture Trustee for the two Collateral Trusts, had argued that because the security was non-operating property these Collateral Trusts were entitled to treatment far superior to that accorded them by the 10-triple-30 distribution. I rejected that argument. On the other hand, in considering the secured bank settlement, weight was given to the nature of the security securing the secured bank's loan, the stock of Pennco. In the context of this Plan which incorporates a large number of compromises and seeks to avoid the ultimate litigation of a variety of complex and unanswered issues, it did not seem appropriate to recognize the potentially unique character of one creditor's security and not the others. Therefore, Irving Trust's Collateral Trusts were included within the group to receive Series A preference stock. Again, this modification for the benefit of the collateral trusts was possible without doing violence to the Plan.

The Consolidation Mortgage's position is in no way similar to that of the Mohawk & Malone and Gold Bond Mortgages or the Collateral Trusts. Exclusion of the Consolidation Mortgage from the group of mortgages to receive Series A preference stock was *sub silentio* previously determined in the *Approval Opinion*, and as the discussion makes clear, there is no merit in Bankers Trust's objection to confirmation.

There is another objection which warrants mention. Penn Central Company, the owner of the Debtor's stock, supported the Plan during the approval hearings and voted in favor of the Plan. Under the Plan, Penn Central Company receives 10% of the reorganized company's new common stock. In connection with the hearing on confirmation, Penn Central Company supported confirmation and advocated prompt consummation as in the best interests of the shareholders of Penn Central Company.

Joseph Shaffer, a shareholder of Penn Central Company purporting to act for eight other shareholders who own 147,600 of the 24 million outstanding shares of Penn Central Company, appeared at the hearing and opposed confirmation and consummation of the Plan. Shaffer submitted an affidavit and a copy of his brief on appeal to the Third Circuit. On the same day as the confirmation hearing before this Court, Shaffer initiated proceedings before the Bankruptcy Court presiding over Penn Central Company's Chapter XI proceedings seeking to have the previously entered Order of that Court authorizing an affirmative vote on the Plan set aside. A hearing on Penn Central Company's Motion to Dismiss the proceedings in the Chapter XI court is scheduled a few weeks hence.

Shaffer's strategy appears to be carefully conceived. Ordinarily, this Court would have no jurisdiction to collaterally review an order of the Chapter XI court. On the other hand, the Chapter XI court's Order was entered on April 21, 1978, and no appeal was taken. Now the argument appears to be that this case must come to a standstill until Shaffer's Chapter XI litigation is completed. The simple answer is, however, that Penn Central Company's vote was authorized by the Chapter XI court and this Court accepts that vote as valid.

Apparently, Shaffer also objects to confirmation of the Plan on the ground that it is not fair and equitable to Penn Central Company. No attempt has been made to suggest that there are any changed circumstances supporting Shaffer's contention. Rather, the objection is simply that the distribution to Penn Central Company is inadequate. Shaffer's objection to confirmation must be denied for two reasons: (1) he is not a shareholder of the Debtor as required by § 77(c)(13); and (2) there are no changed circumstances warranting reconsideration of the treatment of the Debtor's stock under the Plan.

In the interests of clarity, it should be noted that Shaffer's complaints are permeated by misconceptions of the role of this Court and the realities of these proceedings. The Penn Central Company's Chapter XI plan is not and never has been before this Court. Therefore, the amount of the reorganized company's stock which is to be distributed pursuant to the Chapter XI plan of Penn Central Company in exchange for Penn Central Company shares is not within this Court's purview. The evils allegedly committed by the United States Government are not curable in this Court or through the Plan of Reorganization. The RRRA is constitutional and implementation of that statute is a matter for the Special Court. When these two aspects of Shaffer's submission are excised, the only remaining point is that if the Trustees obtain a *Valuation Case* judgment of $11 billion, or some other amount of that magnitude, the creditors who are giving up debt claims in exchange for common stock will receive a windfall.

The $11 billion figure is taken from a letter authored by an attorney on the SEC staff who stated that the range of *Valuation Case* recoveries is $500 million to $11 billion. The Special Court's Opinions to date were extensively described in the *Approval Opinion* because they constituted part of the relevant context in which the Plan must be considered. The valuation theories which would generate a *Valuation Case* award approaching $11 billion have been resoundingly rejected by the Special Court.

"We should also advise the parties, in interest of their avoiding the expense incident to complex engineering studies, that we do not intend to consider estimates of reproduction costs, variations on that theme such as 'assemblage value,' value of materials 'in place,' trended original costs, gross liquidation value or societal values." *In re Valuation Proceedings under §§ 303(c) and 303 of the Regional Rail Reorganization Act of 1973* (445 F.Supp. 994, 1031 (Special Ct.1977).

The valuation theories adopted by the Special Court would seem to rule out any prospect of a "windfall" recovery.

I pointed out in the *Approval Opinion* that "the immediate issue is whether the

risks, uncertainties and possible benefits of the *Valuation Case* litigation, and the consequences of the RRRA process, are being fairly apportioned in the distributions proposed in the Plan."[5] The answer I gave was that "the allocations are fair and equitable." The correctness of that answer is demonstrated by considering what Penn Central Company's position would be in the absence of the Plan. The debt claims against the estate far exceed the value of the retained assets. Therefore, the Debtor's stock interests could receive at most only some form of contingent claim against the *Valuation Case* recovery. But if Penn Central Company received only a contingent claim, its stock would be worth pennies for many years to come. When the results of the *Valuation Case* became known, there would be some value to Penn Central Company's stock if, but only if, the recovery was high enough to pay off all other claimants. In contrast, under the Plan, Penn Central Company receives 10% of the common stock of the reorganized company and thereby receives 10% of the value of the ongoing business operations of the reorganized company and the potential increments in that value. Thus, in lieu of waiting a decade in which the Penn Central Company's stock would be worth little or nothing, the stockholders of Penn Central Company will own stock which has value. If they wish, they may still await the outcome of the *Valuation Case*, but they now have other choices as well.

The Plan and the compromises which support it also provide other benefits to Penn Central Company. The certificates of value which are issued by the United States bear interest at 8% compounded annually from April 1, 1976. But, under the Plan, interest on claims, as well as on the new securities, is handled quite differently. (1) The D Notes issued to taxing authorities will bear a 7% interest rate. (2) In calculating the

amount of secured creditors' accrued interest, interest accruals between April 1, 1976, and December 31, 1977, were booked at the contract rate applied only to principal, and the A and B Bonds, which are exchanged for 30% of the secured claimants' claims, bear no interest between January 1, 1978, and April 1, 1981, but thereafter accrue interest at 7% compounded semi-annually to the extent not paid. (3) Sixty percent of the secured claimants' claims are paid in non-interest-bearing securities, preference and common stock. (4) Most unsecured creditors receive no interest at all for the post-reorganization period and the Plan securities issued to unsecured creditors are non-interest-bearing.

The benefit of these aspects of the Plan to the Penn Central Company lies in the fact that all securities ahead of the reorganized company's common stock will be redeemed if the *Valuation Case* base award is approximately $887 million.[6] Any base award in excess of that amount will directly benefit equity and in particular Penn Central Company as a holder of 10% of the reorganized company's common stock. A much different situation would occur in the absence of the Plan. Under the absolute priority rule, it would appear appropriate to accord claimants, secured and unsecured, the benefit of the 8% interest rate on the certificates of value. That interest accrues on the *Valuation Case* award because of the delay in receipt of the award. The parties who suffer from that delay should as a matter of fairness be accorded the benefit of the Government's payment. The impact of such an analysis is substantial. Penn Central Company's contingent claims on the *Valuation Case* proceeds would be subordinated to a vastly increased amount of claims. By way of illustration, if only the amount of claims satisfied by preference stock and common stock is assumed to be satisfied by a debt security issued as of

---

**5.** *Approval Opinion*, 458 F.Supp. at 1346.

**6.** Add to the $797.1 million shown in the *Approval Opinion* (458 F.Supp. at 1346) the additional amount of 1976 base award, $90.26 million, necessary to meet the C–1, C–2, and D

Notes to be issued as the result of recently approved settlements with Amtrak, ConRail, Six Month Creditors, and the State of New York. Included in the calculation is the cost of servicing the D Notes on a current basis.

January 1, 1978, with an 8% interest rate compounded annually, the *Valuation Case* award necessary to satisfy outstanding securities is increased from $887 million to $2,148.6 million.[7] Of course, under the Plan, Penn Central Company begins to participate at a 10% rate if the *Valuation Case* recovery reaches $887 million, and therefore a *Valuation Case* base recovery of $2,148.6 million would result in Penn Central Company indirectly receiving $126 million of the base award in excess of $887 million. Converted to 1987 dollars, this is about $311 million. On the other hand, if there were no Plan, the same base award would generate zero recovery to the Penn Central Company.

It should be noted that the figures used in the preceding analysis are subject to criticism because by hypothetically converting the preference and common stock to debt securities Pennco's asset values would be freed up. On the other hand, a substantial portion of Pennco's value would be absorbed by completing the analysis and according the 8% interest rate to all claims post-April 1, 1976, and all securities issued under the Plan. Moreover, because the debt securities would have a downside risk but no upside gain, it might be appropriate to view any remaining portion of Pennco's asset values as fairly allocable to holders of the converted preference and common stock. The illustration is not intended to assert exact figures or the precise legal consequences, but merely to demonstrate in a general way the very concrete benefits of the Plan to Penn Central Company.

■ In sum, while sympathetic to the protestations of Mr. Shaffer and the frustrations which are associated with the complexity of the various proceedings in this Court, the Chapter XI court, and the Special Court, I remain convinced that the Plan's treatment of the Debtor's stock interest is fair and equitable.

### 2. *Cramdown*

■ Section 77(e) empowers the Reorganization Court to confirm a Plan even if a class rejects the Plan. The Pittsburgh, Fort Wayne & Chicago Railway Company Plan was submitted to four classes of stockholders for vote. None of the 7% original guaranteed stock or the 7% special guaranteed stock was voted. The vote of the common stock, 52.5% in favor of the Plan and 47.5% against the Plan, was below the required two-thirds majority. Notwithstanding these results, the Court finds that the prerequisite conditions of cramdown as specified in § 77(e) are satisfied and the Pittsburgh, Fort Wayne & Chicago Railway Company Plan will be confirmed.

As previously discussed in connection with the objections to confirmation, Penn Central Company voted all of the Debtor's stock in favor of the Plan. When Mr. Shaffer's efforts to annul that vote were described at the hearing on confirmation, the Trustees suggested that the Court might as a precaution consider exercising the § 77(e) cramdown power. I am satisfied that the exercise of the cramdown power would be appropriate and I would exercise that authority if the procedural posture so warranted. The Penn Central Company's vote in favor of the Plan must be considered valid at this point and there is no real utility in formally exercising the cramdown authority.

### B. CONSUMMATION DATE

A very important issue which the Court must now decide is whether to permit consummation to go forward notwithstanding

---

7. From Page 160 of the Amended Plan take the amount of claims secured creditors give up in exchange for preference and common stock, and add that amount, $1,134 million, to the amount of unsecured claims shown on Page 132, $701.1 million, and then subtract $30 million to reflect the Six Month Creditors' settlement to give a total of $1,805.1 million. Calculate the future value of that amount 10 years hence at 8% interest compounded annually. The future value of $3,897.1 million is then converted to a 1976 base award of $1,577.6 million. Next, the $887 million (fn. 6, *supra*.) must be adjusted by eliminating the amount contained therein, $316 million, to satisfy preference stock and CBI, to yield $571 million. The $571 million and the $1,577.6 million are added to give a total of $2,148.6 million.

the pendency of appeals from the Order approving the Plan, and the probability that those same appellants will appeal from the Confirmation Order and Consummation Order. Not surprisingly, in their written submissions the supporters of the Plan stress the need for prompt consummation while the appellants argue for delay. In their petition the Trustees have suggested that even if the Plan is consummated immediately, adequate provision could be made in the Consummation Order to protect the interest of appellants. At the hearing, the Trustees presented a specific additional provision to the Consummation Order, ¶ 7.7, which reserves jurisdiction in the Reorganization Court to order, after consummation, the payment of cash and the issuance of securities of the reorganized company in amounts necessary to accord to the appellants the full benefit of any success they may achieve in the Court of Appeals. (The indentures and other documents would be amended to bring the documents into conformity with the Trustees' proposal.)

Supporters of the Plan have reiterated their position that the Plan should be consummated forthwith. The Securities and Exchange Commission has also advocated prompt consummation as the course most consistent with the interests of the public security holders who have accepted the Plan and who are to receive cash and securities on consummation.

Some of the appellants are satisfied with the Trustees' proposal (Irving Trust and Bankers Trust). Others suggest that the Confirmation Order should be entered, but immediately stayed, either until the appeals are decided (Manufacturers Bank of Detroit), or until November 15, subject to reconsideration at that time (Wilmington Trust). One appellant (Bank of New York) is satisfied with the Trustees' proposal only if the additional A Bonds it seeks on appeal

are actually reserved and set aside on consummation date. Wilmington Trust and Manufacturers National Bank of Detroit also urge that, if their requests to delay consummation are not honored, the securities they seek on appeal should be set aside.

I shall now briefly review the factors which must be considered in arriving at a decision.

The need for prompt consummation is indeed very great. The major compromises upon which the Plan depends are conditioned upon actual consummation of the Plan this year, as are the further settlements recently approved. As a practical matter, therefore, the situation must be regarded as presenting a choice between prompt consummation or the possibility that there will be no Plan in the foreseeable future.

Of almost equal importance is the desirability of having the reorganized company established and operating, under the control of its board of directors, as soon as possible. This is essential for efficient planning in any event, but is particularly vital here because of the importance of obtaining the benefit of the debtor's huge tax-loss carryforwards. Unless consummation occurs well in advance of the end of this calendar year, there is a substantial likelihood that some of these benefits might be lost.[8]

In short, delay in consummation involves grave risks, which cannot, as a practical matter, be guarded against by the posting of security as a condition of stay.

Apart from these compelling reasons, equitable considerations militate against further delaying distributions to the overwhelming majority of creditors satisfied with the Plan, merely because the Indenture Trustees of a handful of issues and a relatively few individual creditors seek better treatment than the Plan provides.

---

8. The 1979 income of the reorganized company will be sheltered, but additional 1979 income of about $224 million can be sheltered, if sources can be acquired. While it would theoretically be possible to obtain the full benefit by corporate action late in 1979, the likelihood of achieving that result diminishes with each day after January 1, 1979. Only the Board of Directors of the reorganized company can plan and carry out the negotiations leading to the required transactions; no serious negotiations can occur until its corporate existence commences; and a great deal of lead-time is required.

Having thus summarized the important reasons for prompt consummation, it is necessary to refer to other factors which must be taken into account. It is, of course, extremely important to avoid prejudicing the appellate rights of the appellants. This Court should take no action which could reasonably be interpreted as an attempt to moot the appeals, or to deprive the appellants of the fruits of any victory they may achieve at the appellate level. A more subtle but equally important point is that the Court must take no action which could be interpreted as attempting to control the timing of appellate decision, or as interfering with the Court of Appeals' determination as to when and how the appeals should be decided.

And finally, I believe it is desirable, if at all possible, to reduce the need for burdening the Court of Appeals with interim applications for stays, and to increase the likelihood that any applications which may be presented to the Court of Appeals will not need to be acted upon until the appeals themselves have been argued.

The remaining task of this Court is to determine how these various competing considerations can best be accommodated.

Most of the appeals originally taken from the Approval Order have been withdrawn. Although the reasons the remaining appellants' advance in support of the relief requested pose fundamental challenges to the theoretical basis of the Plan, with one exception the adjustments they seek are limited in scope. Even if each appellant were to be fully successful on appeal the feasibility of the Plan would not be jeopardized. Complete success on appeal would result in

a reduction in the amount of B Bonds, Preference Stock, and Common Stock to be issued and a substantial increase in the amount of A Bonds to be issued. Notwithstanding this increase in the total amount of A Bonds issued, only a modest amount, if any, of A Bonds would remain unsatisfied in 1987.[9] A *Valuation Case* base recovery of approximately $594 million would fully satisfy the A Bonds outstanding.[10] Any A Bonds not satisfied from *Valuation Case* proceeds would be payable over ten years in equal annual installments with accrued interest. It cannot fairly be contended, and indeed no one has asserted, that potential debt of this magnitude renders the Plan not feasible.

The issuance of any new A Bonds to satisfy the appellants would have serious ramifications for other creditors, in that it would decrease the likelihood of early redemption of A and B Bonds, and increase the likelihood that some of their debt securities would be converted to equity. The adverse impact upon other participants, while serious, would be precisely the same, whether consummation occurred before or after the appeals were decided. Notwithstanding this potential impact and the possibility that the Court of Appeals might adopt reasoning which would, if implemented throughout the Plan, result in better treatment to the holders of bonds for which no appeal has been taken, no non-appellant has objected to immediate consummation. That being so, the remaining question is whether or not the Trustees' proposal adequately protects the interest of the appellants.

In my judgment the Trustees' proposal for a comprehensive reservation of jurisdic-

---

**9.** The Appendix to this Opinion is an attempt to calculate, subject to the assumptions stated, how the issuance of more A Bonds would work out. The estimated A Bond overhang of $46.08 million may or may not prove correct. An 8.6% increase in the forecasted ADP proceeds for 1978 through 1983 would completely cover the overhang. Moreover, even if a much smaller percentage increment in ADP proceeds was obtained, if the increment was in the early years, the overhang would be eliminated because interest costs, which begin in April of 1981, would be avoided. There is also the possibility that some of the estimates of payments and the reserves will prove too high or unnecessary.

**10.** *Valuation Case* award necessary to pay all Notes $398.3 million, (*Approval Opinion*, 458 F.Supp. at 1346), plus the base award to cover the settlements (fn. 6 supra), $90.26 million, plus the base award to cover B Bond principal and interest (see Appendix) $86.5 million, plus the base award to cover the outstanding A Bonds, $18.65 million.

tion is more than adequate. It guarantees to the appellants that to the extent that they are successful this Court will have reserved jurisdiction to direct the payment of cash or the issuance of securities adequate to comply with any appellate mandate or to implement any appellate decision on remand. I see no purpose in specifying amounts of A Bonds or cash to be reserved as requested by some of the appellants. It is theoretically possible that on a given day in 1979 or 1980 there would not be cash on hand to satisfy what the appellate process found the appellants were entitled to. On the other hand, the forecasted asset disposition proceeds from now through 1980 is so great that cash would shortly become available. Issuance of additional securities poses little problem.

■ The one exception to the foregoing comments is the appeal which has been filed on behalf of a small number of stockholders of Penn Central Company, the Debtor's sole stockholder. These appellants contend that the Approval Order should be vacated in its entirety, and that reorganization of the Debtor should await the outcome of the *Valuation Case.* For the reasons stated in connection with their objections to the confirmation, their standing in these proceedings is so dubious, and the merits of their arguments so tenuous, that the pendency of their appeal plainly does not justify delaying consummation.

■ Having considered all of the foregoing factors, I have concluded that the consummation date should be fixed for October 24, 1978.

The next question is whether any distributions should be made to the bondholders under mortgages for which Indenture Trustees have taken appeals. The Trustees have proposed a procedure which has much to commend it. Holders of bonds for which an appeal has been taken would have the option of accepting the distributions specified in the Plan and foregoing the right to any benefits which might accrue from the appeal, or waiting until the appeal was decided and then receiving a distribution which was consistent with the results on

appeal. Presumably, this choice would be exercised only after disclosure satisfactory to the Trustees, the appealing Indenture Trustees, and the Court. Individuals who voted in favor of the Plan would have the option to stick by their original judgment. The drawback is that persons holding identical bonds would receive different treatment under the same Reorganization Plan. Yet, I am quite certain that if the bondholders were given the choice of waiting until the appellate process is concluded or accepting the distributions as specified in the Plan, a great many would accept Plan distribution and execute releases of any rights on appeal.

An alternative to this procedure would be to distribute to all pursuant to the Plan on consummation date, but if any of the appeals are sustained, the securities to be replaced would be called in exchange for the new securities. For example, if it were found that a particular bond issue was entitled to Series A Preference Stock instead of Series B Preference Stock, the Series B would be called and the Series A would be issued. While this approach appears relatively easy because all the reorganized company's securities will be in registered form, it ignores the large number of bondholders involved, the fact that most of the bonds are now in bearer form, and the substantial burdens of the issuance and recall process. There is also an appearance of unfairness in that the bondholders have the best of both worlds. On the other hand, this Court has previously decided that they are entitled to that which is provided in the Plan, and giving it to them now seems entirely fair. The final alternative is simply to withhold distribution to the bondholders under any mortgage for which the Indenture Trustee has taken an appeal. Since at least some of the Indenture Trustees have asked that the consummation be stayed, it seems somewhat anomalous that they would object to having that relief granted in partial form.

■ There is no clear balance in favor of any of the alternatives. I am concerned that the situation be as clear as possible to the public at large, and that money and

time not be wasted by having two distributions when one would suffice. My conclusion is that the best approach is to withhold all the distributions to bondholders under the mortgages for which the Indenture Trustees have taken appeals until December 15, 1978.

Before that date arrives, counsel will have an opportunity to be heard with respect to whether or not the distribution should be withheld for some short additional period. Pending an order authorizing distribution, cash due under the Plan to the bondholders under mortgages for which appeals have been taken will be escrowed in an interest bearing account. Any interest earned on the account after the date on which any other class J creditor receives his distribution from the exchange agent will be added on a pro rata basis to the cash distributions which are later made. As for the securities, they will be issued but not distributed. If the appellate process is concluded in time to permit distribution shortly after December 15, 1978, no additional problems will arise. In the event there is no such distribution, then an accommodation would have to be made to take account of the December 31, 1978 redemption of A Bonds. This redemption is forecasted at $169 million. The total A Bonds under the mortgages for which appeals are pending constitute 17.79% of all A Bonds to be issued under the Plan. Therefore, that percentage of ADP proceeds will have to be set aside for later application when distributions are made. I recognize that it can be argued that a slightly different procedure should be followed. If the maximum amount of A Bonds which may be required if all the appeals are successful is taken account of, the set aside percentage increases to 32%. I do not mean to foreclose that result. Counsel will have an opportunity to express themselves on that point in connection with the hearing which will be held to determine what happens after December 15, 1978.

## C. OBJECTIONS TO THE CONSUMMATION DOCUMENTS

The consummation documents (the amended charter and new bylaws of the reorganized company, the forms of the securities and the indentures under which the securities will be issued, and related documents) have been submitted to the parties for review and comment. Most of the suggestions of the parties are now incorporated in the revised versions of the documents which are before the Court for approval. Considering the complexity of the Plan, the fact that such a small number of disputes remain is a tribute to the draftsmen.

In conformity with Section 4.3 of the Plan, both the A and B Bond Indentures provide that redemption is by lot until December 31, 1987. Thereafter, redemption is pro rata. Holders of $100,000 of either A or B Bonds are, however, permitted to elect pro rata redemption in lieu of redemption by lot. Many of the Indenture Trustees [11] and two of the secondary Debtor Trustees, Messrs. Kohl and Leary, have vigorously contended that all redemptions should be pro rata. The Securities and Exchange Commission while generally satisfied with the redemption method specified in the Plan and Indentures suggests that if there is to be a change in the redemption scheme it should be to make all redemptions by lot.

There are two aspects to the problem. First, there is the flavor of a preference for those who will hold $100,000 or more of either issue. In the circumstances, however, this is not very troubling. The administrative complexities of implementing pro rata redemption of the bonds held by a relatively small number of persons are substantially less than the complexities of an across-the-board pro rata redemption scheme. Second, there is a possibility that some B bondholders will have the full amount of their bonds redeemed but others will have their bonds converted to common stock. If the appellants from the Approval Order are not successful on appeal, there will, in all likelihood, be one B Bond re-

---

11. The Objecting Indenture Trustees are listed in Document No. 15885, as amended. The Ob-    jecting Indenture Trustees will be referred to as the "Indenture Trustees."

demption. Approximately $25 million in B Bonds are forecasted to be redeemed in 1983. Redemption of the balance of the B Bonds depends upon the amount of the *Valuation Case* recovery. If the recovery is $488.55 million, there will not be any redemption of the outstanding B Bonds, whereas the full outstanding balance of the B Bonds, including interest, will be satisfied with a *Valuation Case* recovery of $571.21 million.[12] Assuming a recovery between these two amounts, for example, $527.88 million, and that the *Valuation Case* proceeds are received before the pro rata redemption provision applies, half of the B Bonds will be fully paid and the balance will be converted to common stock. Although the by lot redemption scheme is fair in the abstract, a pro rata redemption scheme would be preferable in these circumstances.

The A Bonds are somewhat different. If none, or only $20 to $30 million in additional A Bonds are issued as the result of the appellate process, all the A Bonds will, in all probability, be redeemed by 1983. The consequence of being at the bottom of the redemption list is merely a brief delay in payment. Moreover, the 7% interest begins to accrue on April 1, 1981. Even if the result shown in the Appendix occurs, there would be $46 million in A Bonds outstanding, assuming the *Valuation Case* proceeds were not adequate to retire them, but the A Bond debt would be hard debt of the reorganized company and there is every reason to believe that it would be refinanced or paid pursuant to the extension provisions of the Plan. Therefore, the A Bond indenture is generally satisfactory.

Changing the B Bond redemption scheme is desirable, but there are some obstacles to consider. First, there is some question as to whether the bonds could be listed on national exchanges if there is pro rata redemption. Second, even if listed, once the bonds are reduced by partial redemption below $1,000 or to a number between any two

multiples of $1,000, the bonds would no longer be marketable. The Securities and Exchange Commission concurs in this view. Giving up marketability, particularly as of the date of issuance, would be extremely unfortunate. One partial solution to the B Bond problem is to have redemptions from ADP proceeds occur by lot, but permit pro rata redemptions from *Valuation Case* proceeds. If this approach is adopted, whenever *Valuation Case* proceeds became available for redemption of B Bonds the whole issue would be called. The problem is that it is possible there will be *Valuation Case* proceeds available to redeem only a portion of the B Bonds outstanding and there will also be unliquidated *Valuation Case* securities which might not be liquidated for some months or years after the *Valuation Case* proceeds were distributed to B bondholders. Therefore, if the B Bond issue were called, there would have to be a mechanism for later distributing the proceeds from liquidation of the *Valuation Case* securities. Moreover, there is always the possibility of a Tucker Act action in the Court of Claims which might not be concluded until substantially after the receipt of *Valuation Case* proceeds.[13]

There is ample time to work on the problem and, therefore, I will reserve judgment on the issue. The Trustees are directed to examine the problem and the Court's expression of concern to determine what changes can be made without resulting in the denial of listing on the exchanges. Moreover, the Trustees should address the question of whether or not any changes which are suitable for the B Bonds are also appropriate for the A Bonds. The Trustees will be required to file their report on this subject and serve it on the parties no later than September 5, 1978.

■ The A and B Bond Indentures, as well as other indentures, contain a covenant that the Company shall prosecute the *Valuation Case* in such manner as its Board of

---

12. This example is oversimplified because all accrued interest is paid before there is any redemption.

13. Of course, none of this will occur if the *Valuation Case* result is approximately $571.21 million or more.

Directors determines "to be in the best interests of the Company." It is suggested by some of the Indenture Trustees that the following be substituted: "prosecute the *Valuation Case* in such manner as the Board of Directors determines will maximize the *Valuation Case* proceeds," but the Company shall not be required "to expend more time or money on the prosecution of the *Valuation Case* than would reasonably be expended by a claimant entitled to all the *Valuation Case* proceeds." Although the proposed amendment seems merely an explicit statement of what was the intent of the covenant now in the Indentures, the Trustees have opposed the amendment on the ground that it would inhibit settlement of the *Valuation Case* because "Directors might well fear the difficulty of proving, in the face of a dispute, that better results would not have been obtainable through litigation." The fear expressed by the Trustees is clearly unwarranted. The amendment would fully accommodate a settlement of the *Valuation Case*. In light of the delicate nature of the relationships between the various securities the amended version is preferable. It should be included in each of the Indentures which contains this covenant.

█ A minor objection is that although the granting clauses of the Series A and B Bond Indentures are stated in extremely broad language, the granting clauses do not contain the term "security interest" as that term is understood under the Uniform Commercial Code. There is no harm in including that term in the granting clauses, and, therefore, the Trustees will be directed to include that term. The other objections made by the Indenture Trustees are without merit.

█ The State of New Jersey seeks a new covenant in the C Note Indenture precluding the reorganized company from incurring liabilities other than in the ordinary course of business, and in the D Note Indenture, a lien on all after acquired property of the reorganized company and certain protective covenants which have been given to the Series A and B Bonds. Clearly, each of the requested changes would enhance the position of the State. None of the changes are, however, required under the Plan and I do not believe they are necessary. Moreover, to some extent the changes are predicated upon a myopic view of the interrelationship of the various securities. For example, none of the debt securities to be issued under the Plan will have a lien on after acquired property. To accord such a lien to the D Notes would constitute an unnecessary restraint on the conduct of the affairs of the reorganized company. The activities which might be inhibited are those which in the long run might well benefit those claimants who will receive common stock under the Plan. In sum, I find that New Jersey's request for changes in the C and D Note Indentures are not required by the Plan and are not necessary to accord the State adequate protection.

## D. OBJECTIONS TO THE CONSUMMATION ORDER

The Trustees have presented a comprehensive Consummation Order and Final Decree. Numerous objections were filed in response to the Trustees' petition, but many have been withdrawn or mooted by proposed changes in the Order. Except as herein specified, I have concluded that the objections are without merit.

█ The State of New Jersey and the Cleveland Board of Education have raised issues which pertain equally to all taxing authorities. Under the Plan an interest payment on the Series D Notes was due on June 31, 1978. The proposed Order contemplates distribution of that interest payment with the Notes themselves. Considered against the background of the taxing authorities' initial opposition but later support of the Plan, and the fact that the taxing authorities will receive no equity-type securities, it is appropriate to require that in addition to the D Note interest payment the Trustees shall also pay interest on that amount until the consummation date calculated at the same rate as that specified in § 5.5 of the Plan. This adjustment brings the treatment of the D Note interest pay-

ment into conformity with the provisions for interest to be paid on the cash payments due taxing authorities.

The process of distributing to the taxing authorities involves a number of steps. First the Trustees are to inform the taxing authority of the amount that they believe is owed, and thereafter the taxing authority is to execute a release and return it to the Trustees or the reorganized company. Then, the Exchange Agent is to be informed by the reorganized company as to the payee, and the distribution is to be mailed out by the Exchange Agent. On the whole, this process appears to be calculated to serve the best interests of the estate without unduly delaying a distribution to the taxing authorities. It must be remembered that the overall process of making distributions under the Plan will be monumental in scope. I do believe, however, that the taxing authorities and the public they serve are entitled to get the fastest service feasible. To that end, the Trustees are directed to use their best efforts to send all notices of the amount owed before September 20, 1978 and to be able to notify the Exchange Agent of the amounts due no later than October 20, 1978, provided that the Trustees receive the taxing authority's release on or before October 11, 1978. The releases should also indicate that taxing authorities have the option of picking up their distributions from the Exchange Agent rather than having them mailed out. The mechanics of that election and the safeguards that may be necessary should be a simple matter for the Trustees to work out.

■ New Jersey's request that the E Note Indenture be submitted to the Court for approval is also reasonable. While it is not at all clear that the taxing authorities have a valid basis for requesting that the A Note Indenture also be submitted to the Court for approval, I believe both Indentures should be submitted to the Court for approval so that the parties will have an opportunity to determine whether or not the Indentures conform to the Plan. It is not necessary that this be accomplished immediately because it is not anticipated that

A Notes will be issued, and if any are issued it will not be for several years, and the E Notes cannot be issued until after the conclusion of the *Valuation Case*. Therefore, the Trustees, and their successor, the reorganized company, will be directed to submit the A and E Note Indentures no later than April 1, 1979. If a hearing is required, the hearing date will be set shortly thereafter.

■ There is one oversight in § 403(iii) which should be remedied. A creditor who has liquidated all his unsecured claims but who is a party to an executory contract which has now been disaffirmed should be able to receive his distribution on the liquidated unsecured claim even though the claim arising from the rejection of the executory contract has not yet been liquidated.

■ The non-bankrupt leased lines filed a great many objections to the Consummation Order. The Order has been slightly refined and counsel for the Trustee has stated on the record (Transcript 18,527–28) an interpretation of the reservation of jurisdiction which meets, in my judgment, the essence of the objections. After the consummation of the Plan, claims of the non-bankrupt leased lines may be litigated before this Court, and if liability is found, the claim will be classified and the distribution fixed accordingly. However, if the Court finds that for some reason the distribution as specified under the particular classification is not fair and equitable for the non-bankrupt leased line some other form of satisfaction of the claim may be ordered by the Court. That being the case, the non-bankrupt leased line interests are fully protected. Moreover, the amount of the potential leased line claims is relatively modest, and there is no need to establish escrow arrangements to protect their interests. Distributions ordered by the Court can and will be satisfied forthwith.

### E. THE ROLE OF THE BOARD OF THE REORGANIZED COMPANY

A perusal of the corporate documents involved in the consummation of the Plan underscores the intricate and delicate relationship between the various creditor interests in the Penn Central estate. On the

whole, of course, their interests coincide: the success of Pennco as an ongoing business; development by the reorganized company of other corporate activities which maximize the benefits of its tax-loss carryforwards and constitute sound ongoing business operations; and the successful prosecution of the *Valuation Case*. There are, however, some situations in which the Board of Directors of the Company will find it necessary to make decisions which will affect one class of owners somewhat differently from the others. This is an unusual situation for a board to confront, but it arises because of the complexities of the capital structure of the reorganized company. There is no reason to suppose that the Board will not be equal to the task.

I reiterate the view expressed in the *Approval Opinion*, namely, that the parties and their counsel are to be congratulated for a job well done.

## APPENDIX

A. Relief Sought on Appeal (Source:
Trustees' Memorandum (Doc. No. 16107))

| | |
|---|---|
| Wilmington Trust, as Indenture Trustee of the Michigan Central Collateral | $6.5 million in Series B Preference and $6.5 million in common stock replaced by $13 million in cash and A Bonds; or, in the alternative, Series A Preference for Series B Preference |
| Bank of New York, as Indenture Trustee of the R&I Mortgage. | $43.8 million in B Bonds replaced by $43.8 million in A Bonds |
| Manu. Nat'l Bank of Detroit, as Indenture Trustee of Lake Shore Collateral | $5.9 million in Series B Preference stock replaced by $5.9 million in A Bonds |
| Bankers Trust, as Indenture Trustee of Consolidation Mortgage | $24.8 million in Series B Preference stock replaced by $24.8 million in Series A Preference stock |
| Irving Trust, as Indenture Trustee of Mohawk & Malone mortgage | $.590 million of A Bonds, and like amounts of Series A Preference and common replaced by $1.777 million in cash |
| Irving Trust, as Indenture Trustee of NYC 6% Collateral Trust and P.C. 6½% Bonds | Reorganized company assumes total obligation, $15.481 million, and leaves P&LE stock pledged, or distributes stock in full satisfaction |

---

### B. *Method of Quantification*

An appellate award of cash would have the effect of reducing ADP proceeds available to redeem new securities. An award of A Bonds would increase the amount of A Bonds to be satisfied. The net effect of either would be upon the redemption of A Bonds. For convenience, it will be assumed that only additional A Bonds would be required to be issued.

If the P&LE stock either remains subject to pledge or is distributed, the forecasted ADP proceeds in 1983 would be reduced. The net impact on redemption would be the same as awarding A Bonds.

Based on (A) above, and the method stated herein, the maximum increase in A Bonds would be $79.36 million.[x]

### C. *Relief with No Impact Except Upon Other Claimants*

Substitution of $24.8 million in Series A Preference stock allocated to the Consoli-

---

x. The $1.777 in additional cash sought by the Mohawk & Malone replaces, in part, $.590 in A Bonds. Thus, the total only includes $1.18 million to cover substitution for Series A Preference stock and common stock.

dated Mortgage for $24.8 million of Series B Preference stock would dilute the benefit of the Series A Preference stock to the four bond issues which are to receive Series A Preference stock and increase the amount of the Series A which is prior to Series B Preference stock.

### D. *Impact on Redemption*

1. ADP proceeds satisfy securities prior to A and B Bonds first. Thereafter, ADP proceeds are applied to A Bond interest, A Bond principal, B Bond interest, and B Bond principal, in that order.

2. Beginning with the "Revised Eleven-Year Cash Flow Projections" (Doc. No. 14434), determine the effect of issuing $79.36 million in additional A Bonds.

3. Principal of A Bonds outstanding on December 31, 1980, is $39.3 million ($344.2 million less $304.9 million redeemed). Add $79.36 million in A Bonds for a total of $118.6 million.

4. Apply cash flow to the $118.6 million.

| 1981 | Int. 2d quarter | $ 2.075 |
| | Int. 2d half | 4.150 |
| | | 6.225 |
| | ADP | 9.3 |
| | Available for A Bond Prin. | $ 3.075 |
| 1982 | (A Bond prin. $115.5) | |
| | Int. 1st half | $ 4.042 |
| | Int. 2d half | 4.042 |
| | | 8.084 |
| | ADP | 21.9 |
| | Available for A Bond prin. | $13.82 |
| 1983 | (A Bond prin. $101.68) | |
| | Int. 1st half | 3.55 |
| | Int. 2d half | 3.55 |
| | | 7.10 |
| | ADP | 62.7 |
| | Available for A Bond prin. | 55.6 |
| 1984 | (A Bond prin. $46.08) | |
| | Int. 1st half | 1.61 |
| | Int. 2d half | 1.61 |
| | | $ 3.22 |

5. In 1984 and thereafter the accruing interest would be $3.22 million per annum. The B Bond interest payment shown in the cash forecast is from Pennco dividends. Presumably, the A Bond interest would be satisfied from Pennco dividends.

6. Net result, $46.08 million in A Bonds outstanding as of 1987, with no interest due.

7. Reduce the $223.1 in B Bonds shown on the cash flow by $43.8 million, so that the amount issued would be $179.3.

8. The B Bond interest payments in 1981 and 1982 would not be affected by the additional A Bonds. In 1983, there would be no B Bond interest payment or B Bond redemption. The B Bond interest application shown in 1984 through 1987 would be reduced by $3.22 million to service the A Bonds.

9. Calculation of the accrued interest is complicated, but it is estimated that as of December 31, 1987, $179.3 in B Bonds plus $34.39 in B Bond interest will be due. The total principal and interest of $213.69 compares with $204.6 shown on the cash flow. The small amount of the variance is attributed to the reduction of $43.8 million in B Bonds issued.

### E. *Effect of A Bond Overhang*

Even if the $46 million in A Bonds are not satisfied by *Valuation Case* proceeds, the burden on the reorganized company would be ameliorated by the fact that unsatisfied A Bonds are extended for 10 years and satisfied by 10 annual installments.