Brenda EVANS et al., Plaintiffs,

v.

Madeline BUCHANAN et al., Defendants.

Civ. A. Nos. 1816–1822.

United States District Court, D. Delaware.

Jan. 19, 1979.

Joseph A. Rosenthal and Irving Morris, of Morris & Rosenthal, Louis L. Redding, Wilmington, Del., Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D. C., for plaintiffs.

Aida Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

Richard R. Wier, Jr., Atty. Gen., State of Delaware, and Regina M. Small, Asst. Atty. Gen., State of Delaware, William Prickett and Mason E. Turner, Prickett, Ward, Burt & Sanders, Wilmington, Del., Philip B. Kurland, Chicago, Ill., for defendant State Bd. of Ed.

Henry N. Herndon and Edward M. McNally, Morris, James, Hitchens & Williams, Wilmington, Del., for New Castle County School Dist.

Howard M. Handelman, Bayard, Brill & Handelman, P. A., Wilmington, Del., for New Castle County Vocational-Technical School Dist.

## OPINION

MURRAY M. SCHWARTZ, District Judge:

This opinion addresses the plaintiffs'[1] motion for an order approving the Wilmington Board of Education's establishment of a $40,000 escrow account to permit payment

---

1. While originally presented on behalf of the private plaintiffs and the Wilmington Board of Education, the intervening plaintiff, the motion may now be maintained only by the private plaintiffs because the Wilmington Board has ceased to exist. *See Evans v. Buchanan*, 555 F.2d 373, 382 (3d Cir.), *cert. denied*, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

of legal fees and expenses for the continued representation of the plaintiffs' interest in this litigation.[2] A summary of the procedural and factual background is necessary to place the matter presently before the Court in its proper perspective and to understand the nature of the controversy surrounding the establishment of this escrow fund.

On June 19, 1978, the Wilmington Board of Education authorized the appropriation of $40,000 to be placed in an escrow account subject to approval by this Court. The purpose of the fund was to provide for the continued representation of plaintiffs' interest following the dissolution of the Wilmington Board of Education and the transfer of its authority to the New Castle County Board of Education (hereinafter NCCBE) on June 30, 1978. As the Wilmington Board's authorization and appropriation recited:

> In order to secure adequate enforcement of the rights of the children of Wilmington, and to insure that the effort and money expended to date do not come to naught because of the lack of the extraordinary skills, knowledge and efforts of legal counsel beyond the present appellate state, the Board hereby determines to and does authorize Louis R. Lucas and Paul R. Dimond, their firms and such counsel as they may associate, to continue to serve as lead counsel for the plaintiffs, including particularly private plaintiffs,

after the transfer of authority to the new Board.[3]

On June 20, 1978, the plaintiffs presented a motion to the Court seeking approval of the escrow account.[4] While maintaining that the Wilmington Board, acting within its corporate power, was authorized to make an advance payment to counsel for future services, the plaintiffs sought the Court's approval of the escrow fund in the interest of disclosure and cooperation with the New Castle County Planning Board. The Court, preserving the Wilmington School Board's authority to establish the fund before its monies reverted to the NCCBE on June 30, 1978, entered an order on June 23, 1978, authorizing the escrow account pending a resolution of the merits of the fund.[5] Presently before the Court is plaintiffs' motion for a ruling on the validity of the Wilmington Board's action in establishing the escrow fund on June 19, 1978.[6]

The NCCBE raises three principal objections to the plaintiffs' motion, each of which will be addressed by the Court.

## I. The Law of the Case

Both this Court[7] and the Third Circuit Court of Appeals[8] rejected the appointment of a special master or other monitoring body to oversee the development and implementation of the Court's desegregation plan. Arguing that the plaintiffs' motion is merely a subterfuge for the appointment of monitors,[9] the NCCBE maintains that the

---

**2.** The funds appropriated pursuant to the Wilmington Board's June 19, 1978, authorization and appropriation are presently held by the Delaware Trust Company, the escrow agent, pursuant to the Court's order of June 23, 1978. Doc. 844.

**3.** Doc. 838 (attachment).

**4.** Doc. 838.

**5.** Doc. 844.

**6.** The Court will defer consideration of the NCCBE's argument regarding the Court's power to "award" attorneys' fees until such time as that problem is before it.

**7.** Evans v. Buchanan, 447 F.Supp. 982, 1019–20 (D.Del.1978); Evans v. Buchanan, 416 F.Supp. 328, 365 (D.Del.1976).

**8.** Evans v. Buchanan, 555 F.2d 373, 382 (3d Cir.), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

**9.** In particular, the NCCBE points to language in the plaintiffs' motion which states that plaintiffs' counsel will conduct "investigation, discovery, negotiation" as conclusive evidence that the plaintiffs "are once again seeking the appointment of monitors of the NCCBE's desegregation plan." Doc. 879 at 6. An examination of this language, however, in its proper context, reveals that the plaintiffs were addressing the need for investigation on yet unresolved matters that may require judicial attention depending upon the actions of the State, NCCBE, the Voc-Tech District, private businesses, and private persons. In short, any investigative actions anticipated by the plaintiffs will be in conjunction with legal representation

doctrine of the law of the case prevents the Court from reconsidering any prior ruling of this Court or the Third Circuit regarding the appointment of monitors.

■ The federal doctrine of the law of the case [10] applies to principles of law articulated by both the district courts and the appellate courts. As Professor Moore explains:

> When . . . a federal court enunciates a rule of law to be applied in the case at bar it not only establishes a precedent for subsequent cases under the doctrine of stare decisis, but as a general proposition, it establishes the law, which other courts owing obedience to it *must*, and which it itself will, normally apply to the same issues in subsequent proceedings in that case. 1B Moore's Federal Practice ¶ 0.404[1] at 402–03 (2d ed. 1974).

While designed to promote the finality of judicial action, the doctrine of the law of the case may not be properly invoked where the issue previously presented to the Court differs from the issue presently before the Court. *See Salvoni v. Pilson*, 86 U.S.App. D.C. 227, 231, 181 F.2d 615, 619, *cert. denied*, 339 U.S. 981, 70 S.Ct. 1030, 94 L.Ed.2d 1385 (1950).

■ In *Evans v. Buchanan*, 416 F.Supp. 328, 365 (D.Del.1976), the Court expressly rejected the appointment of a monitoring commission to assist the new school board

in the implementation of the desegregation plan. Similarly, in *Evans v. Buchanan*, 447 F.Supp. 982, 1019–20 (D.Del.1978), the Court refused to appoint a monitoring body that would work directly with the local school authorities to insure implementation of the desegregation decree, stating that "the daily business of running the schools, even during desegregation, [is] peculiarly the function of State and local officials." *Id.* at 1020.[11]

A thorough examination of the plaintiffs' motion indicates that, contrary to the view taken by the NCCBE, the escrow funds will not be expended to employ formal monitors who will serve as overseers of the Court's desegregation order. Rather, the escrow motion stresses that the funds will be used to represent the "continuing and live interest of the plaintiffs in litigation hereafter." [12] It is evident that the plaintiffs' motion contemplates that their counsel will represent their interests in any remaining issues which must be resolved to achieve the demonstrated avowed goals of the former Wilmington School Board. Simply because the articulation of those interests may require the plaintiffs to take a position adverse to that of the NCCBE does not, however, transform plaintiffs'· counsel into Court appointed monitors entrusted with assisting the New Castle Board in its transition to a desegregated school system. In short, the escrow fund was designed to enable the plaintiffs to appoint advocates to

---

on the various issues that remain unresolved in this litigation, not for the purposes of monitoring the general process of desegregation.

**10.** The law of the case principle has been explained by the Supreme Court as follows:

> When matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court. Thus a cause proceeds to final determination. While power rests in a federal court that passes an order or decision to change its position on a subsequent review in the same cause, orderly judicial action, except in unusual circumstances, requires it to refuse to permit the relitigation of matters or issues previously determined on a former review. *Insurance Group Committee v. Denver and Rio Grande Western R. R.*, 329 U.S. 607, 612, 67 S.Ct. 583, 585, 91 L.Ed. 547 (1947) (footnote omitted).

**11.** At a hearing before the Court on October 31, 1977, Dr. Joseph Johnson suggested that the Court institute a monitoring process over the new school board. Specifically, Dr. Johnson recommended "that some mutual board or panel . . . be established *to report directly to this Court* to insure that staff and students and everyone else involved in this desegregation process gets favorable treatment throughout." Doc. 663 I. at 82 (Johnson) (emphasis added).

**12.** Doc. 838 at 2. Among other things, the plaintiffs' motion states that the escrowed funds are necessary to secure adequate legal representation in such unresolved matters as the four-district plan and the effectiveness of the non-discrimination and the non-segregation requirements for vocational schools.

protect their interests rather than to appoint monitors who would be responsible to the Court. Because the Court's prior rulings regarding the appointment of monitors in no way addressed the issues raised by plaintiffs' motion, the Court concludes that granting the plaintiffs' motion will not violate the law of this case.

## II. *The Court's Prior Order*

■ On November 17, 1977, the Court entered the following order:

The Affected Districts are hereby directed to enter into contracts, including collective bargaining agreements, for the purchase or supply of materials or services for any period subsequent to June 30, 1978, only upon the prior authorization and approval of NCCPBE or its designated representative; provided however, the provisions of this paragraph 2 shall not apply to the following:

A. Contracts for minor capital improvements approved by the Department of Public Instruction, and

B. Contracts upon which any obligation of the Affected Districts or their successor(s) shall be fully discharged and satisfied on or before June 30, 1978.[13]

Noting that the Wilmington School Board neither requested nor received authorization from the NCCBE to establish the escrow account, the NCCBE argues that the Wilmington Board's action violated the Court's order and is, consequently, null and void. This contention, while facially attractive, ignores completely the Court's order of June 23, 1978, which expressly approved the establishment of the escrow account pending a future resolution on the merits of the fund. That order, which supplemented the Court's orders of November 17, 1977, and January 9, 1978, governs the Wilmington Board's authority to escrow the funds for subsequent payments.[14] As the plaintiffs correctly remark, "the only issue now is whether the terms of the completed transaction should be carried out." [15]

## III. *Ultra Vires*

The NCCBE's principal argument in opposition to plaintiffs' motion is that the Wilmington Board's action in establishing the escrow fund was ultra vires under Delaware law and hence void. The NCCBE contends that the Wilmington School Board lacked statutory authority to authorize the expenditure of money for the private plaintiffs' counsel. In addition, the NCCBE argues that the Wilmington Board's interest in this litigation passed to the NCCBE on July 1, 1978, and, consequently, that the Wilmington School Board had no interest to protect or further by hiring attorneys for the private plaintiffs.

■ Delaware law provides that local school districts, unlike state officers, departments, boards, agencies, commissions, or instrumentalities, are empowered to employ their own attorneys for all legal services except bond issues. 29 *Del.C.* § 2515 (1976); *King v. Caesar Rodney School District*, 396 F.Supp. 423, 426 n.4 (D.Del.1975). That this statute does not expressly authorize Delaware school districts to employ counsel to represent third parties does not, however, automatically render the Wilmington School Board's action ultra vires. At least one jurisdiction has recognized the implied authority of a school district to employ counsel to represent private parties provided that the litigation involves a question of public importance which directly effects the interest of the public school sys-

---

13. Doc. 647 at 2.

14. The Court's order of January 9, 1978, expressly directed that "[u]pon the transfer of full authority to the New District all real and personal property of the Component Districts comprising the New District shall become the property and become vested in the New District . . . ." Doc. 669 at 2. Under the terms of the January 9, 1978, order, the Court retained jurisdiction over the desegregation process until "the transition to a racially non-discriminatory unitary school system is effectuated and the system is operational." Doc. 669 at 2. Consequently, the Court's order of June 23, 1978, which was entered pursuant to its retained jurisdiction over this action, expressly modified the older order of November 17, 1977.

15. Plaintiffs' Reply Concerning Escrow at 4.

tem or the school district. *See Board of Education of Cincinnati v. Board of Education of Cincinnati,* 4 Ohio App. 165, 168–69 (Ct.App.1915).[16] The reasoning of the Ohio appellate court regarding a school board's power to employ counsel for private parties mirrors the approach taken by the numerous jurisdictions that have recognized a school board's implied authority to employ counsel for "proper school purposes." *See e. g., Barnett v. Hunt,* 223 Cal.App.2d 521, 35 Cal.Rptr. 873 (1963); *Hogan v. Glasscock,* 324 S.W.2d 815 (Ky.App.1959); *Stewart v. Newton Independent School District,* 134 S.W.2d 429 (Tex.Civ.App.1939). As the Kansas Supreme Court succinctly stated:

> Broadly speaking, a school district having the power to sue and be sued may employ an attorney, if the employment is necessary for the protection of the public interests committed to it. The power to employ includes the power to compensate. But the power to employ counsel exists only where a public interest is concerned which the board is charged by law with the duty to protect, and of course school funds cannot be used to pay costs or counsel fees in actions brought ostensibly in relation thereto but in reality for the benefit of private persons. *Wagner v. School District No. 58 of Graham Cty.,* 138 Kan. 428, 26 P.2d 588 (1933).

*Paslay v. Brooks,* 198 S.C. 345, 17 S.E.2d 865 (1941) is not to the contrary. In *Paslay,* the Court ruled that a school district lacked power to authorize the payment of counsel fees in an action brought by individual members of the school board to secure the validity of their election as trustees of the board. Reasoning that the school district had no interest in the success or failure of any candidate who runs for the office of school trustee, the Court stated:

> [A] school district having the capacity to sue and be sued, and the authority to

contract, has no right to exercise the power of employing counsel except in matters relating to its corporate rights or functions. It necessarily follows that a school district is without power to employ counsel and to pay his compensation out of public funds in matters not involving the interests of the schools of the district. *Id.* at 868.

Thus, the decision in *Paslay* is consistent with the numerous jurisdictions that have held that when litigation involving third parties is undertaken strictly for the benefit of those parties, a school board possesses no implied power to employ counsel in the proceedings. *See e. g., Hotchkiss v. Plunkett,* 60 Conn. 230, 22 A. 535 (1891); *Smith v. Pittsburgh School District,* 70 Pa.Super. 184 (1918); *Denman v. Webster,* 139 Cal. 452, 73 P. 139 (1903).

■ The Court's examination of the cases indicates that any inquiry concerning the Wilmington Board's authority to establish the escrow account must focus on the purpose of the litigation and its relationship to the interests of the school system, not merely on the named parties to the litigation. Since 1972,[17] the Wilmington Board of Education has played a leading role in attempting to secure a constitutional system of public schooling in New Castle County for the Wilmington black schoolchildren. The NCCBE does not argue that the Wilmington Board's payment of counsel fees during that period was either unauthorized or ultra vires.[18] Having achieved their legal objectives, the Wilmington Board, consistent with its historical role in this litigation, authorized the payment of funds to insure that the constitutional rights of the Wilmington schoolchildren would not be frustrated following the Court ordered demise of the Wilmington School District. The

---

**16.** *Cf. Austin v. Upjohn,* 13 Cal.App. 733, 20 P.2d 735 (1933) (the Court approved the school district's authority to employ counsel to prosecute a suit brought in conjunction with and on behalf of a private party, reasoning that the school district had an interest in the proceeding).

**17.** Doc. 140.

**18.** In fact, the NCCBE recognizes that "a school board's real interests in desegregation and the constitutional rights of its students justifies hiring attorneys." NCCBE's letter to the Court, November 28, 1978 at 4.

authorization and appropriation entered into by the Wilmington Board on June 19, 1978, contemplates no departure from the past in terms of the interest that will be pursued—the effectuation of a racially non-discriminatory school system in New Castle County—or the parties who will be represented in any future litigation—the black schoolchildren of Wilmington.

While it is true that the escrowed funds will be used to pay the private plaintiffs' attorneys' fees, it is evident that the black schoolchildren are the primary beneficiaries of the Wilmington Board's action. Most importantly, the escrowed funds are to be employed to resolve legal issues that are of vital importance to the New Castle County public school system and possibly to avoid future litigation. Because the Court is convinced that the escrow account was established in good faith to serve and promote a legitimate interest of the New Castle County public school system in a matter of public importance, the Court concludes that the Wilmington School Board did not act ultra vires. The only remaining question is whether the Wilmington Board's interest in these matters passed to the NCCBE on July 1, 1978.

The NCCBE objects to the Wilmington Board's appropriation, claiming that any interest which the Wilmington Board has in protecting the constitutional rights of its students passed to the NCCBE. Although the NCCBE is faithfully carrying out the Court's decree of January 9, 1978, the Court notes that the NCCBE has not demonstrated a strong commitment to protect the interests of the Wilmington minority children in matters falling outside the precise scope of the Court's order. Specifically, the Court cannot fail to note that the NCCBE did not enter an appearance on the appeal to the Court of Appeals that contested the issuance of the secondary remedial decree. The Court also notes that the NCCBE failed to take a position on the petition for certiorari presently pending in the Supreme Court. In addition, the NCCBE did not oppose the local defendants' application for a stay to Justice Brennan or the renewed application to Justice Rehnquist in Septem-·

ber, 1978, which sought a partial stay of the Court's order to keep the Wilmington schools segregated until a determination on the certiorari petition. Consequently, it cannot be concluded that the NCCBE, either in the past or in the future, adequately represents the interests of the plaintiff class in this litigation.

Although the Wilmington School Board no longer exists as a viable and distinct corporate entity, the interests that it previously represented continue to this date. Moreover, the articulation of those interests is vital to the successful implementation of a constitutional public school system in New Castle County. Therefore, the Court concludes that the Wilmington Board's action in establishing an escrow account to advocate and protect the continuing interests in this litigation was not ultra vires.

Submit order on notice within 30 days.